## GERMAN AMERICAN MUTUAL LIFE ASSOCIATION *v.* FARLEY, executor.

1. Where in a written application for insurance, which is prepared by the agent of the company who solicits the insurance and delivers the policy, the applicant makes certain statements as to his physical condition, as to the general state of his health, and as to his rejection by other insurers to whom he has previously applied for insurance, which statements are warranted by him to be true, and which if false might materially affect the risk, a policy of insurance which recites that it is issued in consideration of such statements and of certain other valuable considerations therein expressed, but which does not in terms provide that it shall be void in the event such statements of fact should prove to be untrue, is not avoided as a consequence of the mere falsity of any of such statements, where it appears that even if they were false they were not fraudulently made, and that the fact that they were false was known to the agent of the insurer, who had himself prepared the application and procured the applicant to sign it.

2. Where in effecting a contract of insurance the assured and agent of the insurer are dealing at arm's length, the latter is charged, on behalf of his principal, with notice of any facts material to the risk, of which he may have knowledge, which were not communicated to him with respect of some matter springing out of a confidential relation, and which at that time are present to his mind, whether such facts came to his knowledge before or after he became the agent of the insurer.

3. If after a policy of insurance has been issued knowledge be brought home to the insurer that certain statements material to the risk, made by the assured to procure insurance, are untrue, but which were by him warranted to be true, and notwithstanding such knowledge the insurer thereafter receives the premiums in accordance with the terms of the policy, he will, after loss, be held to have waived any forfeiture which might otherwise have resulted from such breach of warranty, and would be thereafter estopped to deny the validity of the policy.

4. The mere failure to state a material fact, when not done fraudulently, will not avoid a policy of insurance.

5. Where an effort is made to impeach a contract of insurance upon the ground that it was issued in consequence of the perpetration of a fraud by the assured upon the insurer, evidence of the good character of the assured is admissible to support his bona fides in the transaction.

6. There was nothing in the evidence to authorize a finding of attorney's fees and damages in favor of the plaintiff upon the theory that the defendant had been stubbornly litigious or had acted in bad faith. Under the view taken by this court of the evidence submitted, the application of the principles above announced renders unnecessary the consideration of the minor errors which were alleged to have been committed on the trial. Inasmuch as the only error committed upon the trial, which might authorize a reversal of the judgment, is that relating to the finding in favor of the plaintiff of attorney's fees and damages, the judgment of the court below is affirmed, with direction that so much of the verdict as allows attorney's fees and damages be written off, and that the costs which have accrued since the rendition of the verdict be taxed against the plaintiff, the defendant in error.

Argued October 18, — Decided November 29, 1897.

Action on insurance policy. Before Judge Butt. Muscogee superior court. November term, 1896.

*Frazer & Hynds, W. A. Wimbish* and *E. D. Burts*, for plaintiff in error.

*Brannon, Hatcher & Martin,* contra.

ATKINSON, J. McArdle made application in writing to the German American Mutual Life Association for a policy of insurance upon his life, which, in accordance with such application, was issued. The application contained answers to certain questions, which were submitted in writing by the insurer to the assured. The questions and answers which are material to be considered in the present case were as follows: Q. "Have you ever had . . shortness of breath? Any other disease of the respiratory organs? Pain in the region of the heart? Palpitation of the heart? Any disease of the heart or blood-vessels?" To each of these questions the assured answered, "No." Q. "Have you ever been declined or postponed by any company? State name of the company." A. "Yes, Penn Mutual." Q. "Have you ever applied to any company for insurance on your life without receiving a policy of the exact kind and amount applied for? If so, state the name of each company." A. "Yes, Penn Mutual, near two years ago." Q. "When did you last consult a physician, and for what reason?" A. "Bilious attack." "Name and address of physician?" A. "Dr. J. E. Walker." Q. "Give names and addresses of the physicians who have attended you or whom you have consulted

during the past ten years, and for what diseases." A. "As above." The application also contained the following statement: "It is hereby warranted that the above statements and answers are true, complete and true in every particular; and they are offered as the consideration for the insurance applied for, which shall not be forfeited, except for fraud and misstatement of age and non-payment of mortuary premiums. It is agreed that there shall be no contract of insurance until the policy shall be issued by the association and accepted, subject to the consideration and stipulations therein contained, during the good health of the person to be insured, and the receipt of the first payment. And I do hereby waive all provisions of law now existing or that may hereafter exist, preventing physicians from disclosing any information acquired in the professional capacity or otherwise, or rendering him incompetent as a witness in any way whatever, and, for himself or any other person accepting or acquiring an interest in such policy, authorizes and requests any physicians to testify concerning the health and physical condition of applicant. Dated at Columbus, the 9th day of August, 1894. (Signed)

"Witness, J. H. Simms, M. D. Francis Joseph McArdle."

The policy issued by the association was as follows: "No. 2931. Amount, $5,000.00. In consideration of the answers, statements and agreements contained in the application for this policy of insurance, which was made a part of this contract, and of the payment of forty dollars as a first payment to be made on or before the delivery of this policy, and a payment of fifteen dollars payable to the association sixty days from the date of this policy, for the general expense fund of the association, and a further annual premium of one hundred and eighty-four and 80-100 dollars, divided into bimonthly instalments of thirty and 80-100 dollars, due and payable on the first day of the months of February, April, June, August, October, and December of each and every year during the continuance of this policy, the German American Mutual Life Association does hereby receive Francis Joseph McArdle, of Columbus, County of Muscogee, State of Georgia, as a member of said association, and within ninety days after acceptance of satisfactory proof of

death of said F. J. McArdle, there shall be payable to F. J.
McArdle the sum of five thousand dollars, subject to all the
conditions, requirements and benefits stated on the back of the
policy. Proof of death of said member shall be furnished to
said association within six months after death, and no suit
shall be brought against this association after one year from
the termination of the life of the member." Signed, J. Donald
Pickard, secretary. D. P. Holland, vice-president. Dated tenth
day of August, 1894.

McArdle died suddenly from natural causes. After due
proofs of death, his executor brought suit upon the policy.
The defendant pleaded not indebted; and further, that the rep-
resentations contained in the application of the assured for the
policy of insurance, touching his physical condition, and which
were made by him at the time the insurance was effected, as
to the general condition of his health, number of physicians by
whom he had been treated, and the number of companies by
which he had been rejected, amounted to warranties touching
such facts; that such representations were material to the risk
assumed; that they were false, and that in consequence there-
of it was misled, and thus induced to enter into a contract into
which it would not otherwise have entered. It further pleaded
a tender back of the premiums paid by McArdle in pursuance
of the contract of insurance. The plaintiff afterwards amended
his declaration, alleging that the defendant was in the premises
stubbornly litigious, and prayed judgment for attorney's fees
and damages. The trial resulted in a verdict for the plaintiff
for the full amount of the policy, with interest, and an addi-
tional sum by way of damages and attorney's fees. It moved
for a new trial upon many grounds; but inasmuch as the real
questions arise upon the assignments of error in the charge of
the court, upon certain refusals to charge, and upon certain
rulings of the court admitting evidence, which are hereinafter
set out, we deem it unnecessary to consider and will not further
advert to the other assignments of error. The assignments of
error which are above referred to are as follows: (4th ground
of motion) "Because the court erred in giving the following
charge to the jury: 'It is insisted upon the part of the plain-

tiff, that not only did Mr. Green, agent of this company, have knowledge of this fact, but that the president of this company had knowledge of the fact that Mr. McArdle had been rejected in other companies. Now, gentlemen, you look to the testimony and see whether or not that is true. If it is true that they had notice, then the question is this: was the notice such as to put a reasonably prudent man upon notice or upon his guard that he might make inquiry? and if it was and they failed to do it, although the answers in the application might have been false and the policy might have been fraudulently obtained,—if that is true, and they went forward and failed to make inquiry and received premiums from Mr. McArdle after that information was imparted to them, then, gentlemen, the court charges you that it was a waiver upon the part of the company, and they would be bound to pay the full amount of the policy.' The objection being that such charge was without evidence to sustain it, was misleading, and incorrectly stated the law applicable to the case on the subject of notice." (5th ground) "Because the court erred in charging the jury as follows: 'If Mr. Green acted as the general agent of the company, and applied to Mr. McArdle for the purpose of insuring him, taking his risk, and Mr. Green wrote the answers of McArdle, and he wrote them incorrectly and knew they were incorrect at the time he wrote them, although Mr. McArdle signed it, the company would be liable if he procured him to do so, unless McArdle had combined and conspired with Green for the purpose of obtaining it fraudulently, he knowing at the time that the answers were not true.' The objections to said charge being that there was no evidence to authorize a charge upon the assumption that Mr. Green was the general agent of the defendant company, and also that the propositions of law were erroneously stated." (7th ground) "Because the court erred in not charging the jury, as requested in writing by counsel for defendant, as follows: 'Moreover, notice to or knowledge of the agent must be given to or acquired by him within the scope of his authority, that is, while he is about the business of his principal, and must come to him in respect to that business. If the agent has knowledge of facts, which knowl-

edge was acquired prior to undertaking the transaction or agency, then such knowledge would not be imputed to the principal.'" (9th ground) "Because the court erred in refusing to charge the jury, as requested in writing by counsel for defense, as follows: 'If an applicant for insurance, in answer to the question whether he had applied to other insurance companies and had been rejected and if so give the name of each, replied, 'yes,' giving the name of one company, and omitting the other companies, then I charge you that such omission to name other companies by which he had been rejected was a concealment; and if you find that this concealment affected the matter material to the risk, then it would avoid the policy, whether or not made in good faith. So that in reply to a question as to what physicians had attended him in the last ten years and give the name of each and he had given the name of but one physician, when in fact he had been attended by several within the time named, then I charge you that if you find that such fact was material to the risk, it would avoid the policy, whether or not made in good faith. The answer to such question contains necessary implication that there is no other insurance than that stated and that no other medical attendant had been consulted by the applicant; and if the facts were otherwise, the answer is as false as if the concealed facts had been expressly denied.'" (21st ground) "Because the court erred in admitting, over the objection of defendant's counsel, the evidence of witnesses John C. Cook, A. C. Bowles, H. F. Everett, and other witnesses, that they were acquainted with the general character of Mr. F. J. McArdle, the deceased assured, in the community, and that such character was good; the objection being to such evidence that the general character of deceased assured was not in issue, and evidence thereto was inadmissible."

Upon the trial, the policy of insurance and the application upon which it was issued were before the jury. Evidence was also introduced, showing the death of McArdle to have occurred April 5, 1895; the circumstances under which he died; that for some years before his death his general health appeared to be good, though he was subject to fainting spells which were

apparently superinduced by some chronic disorder of the stomach, or because of, the failure of the heart to perform its normal functions; that he had not in consequence of ill health lost any appreciable time from his business for a number of years; that Dr. Walker was his regular physician. It further appeared that several other physicians had treated him. One of these, touching the physical condition of the assured, testified as follows: "Knew F. J. McArdle in his lifetime; have known him for about twenty years. He consulted me professionally, and I practiced for him. He consulted me in February, 1891, and February, 1892; remember those years, and think he consulted me in 1893. His trouble was a difficulty in breathing that distressed him more than anything else. I made a diagnosis of his case, and found him suffering with organic disease of the heart. Don't know that there is any technical name for it except organic disease of the heart; he had trouble with valves of his heart; they were insufficient. Any difficulty in breathing is called cardiac dyspnœa, when it is caused from a disease of the heart. I saw that he had organic trouble. Such disease will eventually destroy life if something else does not intervene to destroy it. It is not curable. Do not remember his age at the time I discovered this trouble. I think the effect of such disease upon the probable duration of life of a man 58 years of age would be to shorten it; would not like to give an opinion as to whether a man suffering as McArdle did when I examined him could help knowing that he was seriously diseased; it would depend upon the man, whether he was easily frightened or not. I prescribed emergency remedies for Mr. McArdle, cardiac stimulants, nitrate of glycerine, digitalis, whisky, opium. I don't know whether I explained to McArdle the nature of these remedies; I did to some member of his family. He called to see me at my office and I also called at his house. . . I do not know whether McArdle was at my office or at his house the first time I examined him. He was up and about and able to attend to his business, except when those attacks were on him. When he was not suffering from those attacks, his general appearance was that of a healthy man. Can't say how many times I knew of his suffering with

those attacks; have seen him in an attack three or four times. My impression is I first saw him in his house in '91, and at my office in '92. I gave it as my opinion at the time I saw him that he was suffering from organic heart trouble; don't think I might be mistaken; a man who has much to do with diseases of the heart ought not to make that mistake; it is too pronounced. A man familiar with it don't make a mistake. Don't mean to say that doctors are infallible; they do make mistakes, but not in heart and lung troubles. A well-informed man is a matter of opinion at last. Do not think I told McArdle that he was suffering from this trouble, but I told some member of his family; had to do so in order to leave instructions about taking the medicines." Another of these physicians testified substantially to the same state of facts as to the physical condition of the assured. It was further shown for the defense that the assured, prior to the time the policy sued upon was issued through W. S. Green, who was the agent of the defendant in effectuating the insurance under the policy sued upon, had made application for insurance to the Penn Mutual Life Insurance Company, and had been rejected. It further appeared that he had made application to the Aetna Insurance Company, to the Provident Savings Insurance Company, and to the Mutual Reserve Fund Life Association, by each of which companies he was rejected. A letter written by W. S. Green to D. P. Holland, who was the vice-president of the defendant company, touching the issuance of the policy sued upon, was introduced by the defendant, which letter was dated August 9, 1894, and read as follows: "Your letter of recent date, with blank application, duly received. I send you inclosed an application for $5,000 insurance from F. J. McArdle of this city. Mr. McArdle is a well-known and prominent citizen here, a member of the board of aldermen, and a prosperous hardware merchant. His influence I trust will aid me in securing many other applications for your company in this city. He is a fine specimen of physical manhood and in perfect health, though you will notice that he was rejected near two years ago by the Penn Mutual Life Insurance Company. That was caused by the carelessness and inexperience of the medical examiner, who called

to see him while he was overheated, and excited, and found his pulse 90 per minute, and wrote it so in the application, and as a matter of course that caused him to be rejected. If the medical examiner had had experience or care, he would have called again at another time and found his pulse normal, and the applicant would not have been rejected, as was clearly shown by his obtaining a policy in another company a few months after this. I have selected Dr. J. H. Sims, of this city, as medical examiner, because he is one of the most prominent and reliable physicians in Columbus, and has much experience in that line of business, as he is now the medical examiner of the Mutual Life of N. Y., the Equitable of N. Y., the Penn Mutual, and the Northwestern Masonic Aid Association of Chicago. Hoping to be able to send you other applications soon, I am, very truly yours, [Signed] W. S. Green."

W. S. Green, introduced for the plaintiff, testified as follows: "I was the agent of the German American Mutual Life Association in this city in 1894; became its agent about the 1st of August, 1894, as well as I remember now. . . I was agent for another company at the time when I received this letter, with the circular therein, stating that they would consider applications of rejected risks. They agreed to pay me certain commissions to solicit insurance, if they sent in applications. They agreed to pay me $8.00 on all business I sent them accepted and paid for; I mean $8.00 per thousand. . I solicited Mr. McArdle's insurance; he did not solicit insurance from me. He was at his store when I solicited the insurance. He said he didn't care to make application at all; that he had been rejected several times, and did not care to make application whatever again. He had made application before that through me, and I knew at the time that I approached him that he had been rejected. I showed him that letter, and negotiated with him for this application, during which time I saw him probably a dozen times before he would make the application. I wrote his application for insurance. I wrote the answers of McArdle in the application. In the question put in the application, 'Have you ever applied to any company for insurance without receiving a policy of the exact kind and amount ap-

plied for? if so, state the name of the company,' I wrote the answer, 'Yes, by the Penn Mutual, near two years ago.' Mr. McArdle did not tell me that he had only been rejected by that one company; he didn't tell me anything about that. I knew that fact myself. He did not tell me that he had been rejected by others. A year or two before that I had sent his application to the Aetna Life and Provident Life and to the Mutual Reserve for him. Think in the course of two years I wrote him in several companies. No, he did not tell me that he had only been rejected by the Penn Mutual. The answer to the question, 'Any negotiations now pending?' 'No,' in the application, I wrote it. I knew it of my own knowledge, and wrote it myself. Dr. Simms wrote the answers to questions submitted to McArdle as the medical examiner. I do not think I read the questions and answers over to him before he signed it. I had Dr. Jack Simms appointed medical examiner. He acted in this case. The reason I solicited Mr. McArdle's application for insurance, knowing that he had been rejected in other companies, was because I believed him a first-class risk, entitled to insurance, and did not understand why he was rejected. Thought he was rejected because other insurance companies had rejected him. No, I did not have any other reason. He told me he had not been sick in 40 years when he made application; hadn't been sick enough to keep him from his business in 40 years. I don't remember about his making any secret about it. Yes, the circular had influence over him, and had it not been for that circular I would not have written him in that company. I got this from the German American Life Insurance Company. Received these letters from the German American Insurance Company. Have heard the testimony of Mr. West and Mr. Moses in regard to the conversation which occurred in the latter's office; was not introduced to Mr. West at that time. Soon after Mr. McArdle's death I walked into Mr. Moses's office; don't remember why I went in; and made some remark to Moses about McArdle's death, and about his having $10,000 insurance which I had been fortunate enough to get for him, $5,000 in a New York company and $5,000 in the German American. Mr. Moses

asked me if I didn't have some trouble in getting insurance, and I replied that I had written his application several times but finally succeeded in getting insurance for him in two companies. I heard Mr. Moses's statement. It was all true, everything he said was true, except he said he introduced me to Mr. West at that time." Upon cross-examination he testified: "I first applied for insurance on Mr. McArdle's life in the Penn·Mutual Life Insurance Company. The application was declined; they gave no reasons; he applied for $5,000. I solicited him to make that application. He was only examined once by Dr. Blanchard in that application. Dr. Blanchard went back once or twice afterwards and felt his pulse. . . I think I informed Mr. McArdle that he had been rejected by the Penn Mutual. I don't remember when I next made application for insurance for him; it was several months later. My recollection is the next company he applied to for insurance was the Aetna; am not positive about that. I was not the agent of the company at that time; the reason why I made application to that company was, the other companies were higher. . . He talked as if he might take a policy in that company, and I wrote Mr. Boon in Atlanta in regard to the matter, that I had a customer I would like to write in the company; and he sent me blanks. I solicited Mr. McArdle, and he applied to the general agent of the insurance company. Yes, I was the agent of the company. I knew he had been rejected by the Penn Mutual. Yes, I wrote the application to the company. Am pretty certain that I stated in there that he had been rejected by the Penn Mutual. . . I applied for other insurance for Mr. McArdle; my recollection is he applied in the Provident Savings; am not positive about that. I was not the agent of the Provident Savings. . . McArdle had not requested me to make application to the Provident Savings; the reason I was so interested in trying to get him insurance was—was trying to make some money; my interest was in the premiums. I still considered him a first-class risk, and believed that he would be accepted by the Provident Savings. I knew that there were two insurance companies that did not consider him a first-class risk; don't remember

what I said about former rejections in that application.   .   ..
In April, 1893, or 1894, I wrote an application for him in the
Mutual Reserve.   He was rejected by that company.   .   .   I
wrote out this application for Mr. McArdle and he was present;
he did not tell me that he had not been rejected in other com-
panies than the Penn Mutual.   In the application to the Mu-
tual Reserve, Mr. McArdle did not tell me that he had not
been rejected in any other company except the Penn Mutual.
I wrote these answers from my information, and not from the
information that Mr. McArdle furnished me.   I got my knowl-
edge of the fact that Mr. McArdle had been rejected by these
other insurance companies prior to the time I was agent, or
claimed to have been agent, of the German American.   I did
not state in my cross-examination that I wrote the answers to
the questions for Mr. McArdle and conferred with him as to
the answers he made in the application.   .   .   I presume he
told me who his family physician was.   I didn't ask any such
question as to when he was last treated and for what.   I did
not state on yesterday that he told me that he had not been
examined by a physician in 40 years.   I stated that he told
me he had had no serious sickness, enough to detain him from
business, for forty years.   He had a slight attack of indigestion,
which lasted him for a few hours, but not enough to detain
him from his business.   I did not write out the answers to the
questions of the medical examiner.   Dr. Simms wrote the an-
swers.   I requested Dr. Simms to make the examination, and
I know that I did not write them.   I am satisfied that Dr.
Simms wrote them, and think you will find his name signed
to it.   I had enough to do without writing the medical exam-
iner's questions.   No, I don't know how Dr. Simms got the in-
formation.   I don't remember reading the questions, in the
part of the application made out by me, over to him.   I didn't
ask the question as to whether he had ever suffered from short-
ness of breath; that is in the medical examiner's report.   Yes,
I said that my answer to the question as to the rejection is not
false."

The plaintiff likewise introduced a circular letter, and with
it a letter from James G. West, the president of the defendant

company, copies of which are as follows: Circular Letter: "Dear Sir,—We beg to hand you the prospectus of the German American Mutual Life Association, of this City and State. The object of this company is to provide insurance at the least possible cost, consistent with safety, both to the assured and the association. The officers and board of directors of same are careful, prudent business men, known to the community as worthy of your confidence and esteem. The plans as submitted to you in this prospectus are those giving the greatest equity to the applicant, and we think will meet your hearty approbation as agent. We therefore confidently ask your attention, investigation and co-operation. The State of Georgia will always remain an open territory to this company, and therefore we place you upon a footing of a general agent and upon all business you favor us with a renewal will continue in same for your account as long as the policy remains upon our books year by year. There is also another matter to which we would call attention, of special interest to you as a solicitor: From long practical experience in the field we are assured that in very many cases the rejection of risks is an injustice done both to the agents and the insuring public, caused principally through the carelessness of agents, ignorance of the applicant, and haste of the examiner, which coupled with private reports made upon the habits of the applicant through prejudiced sources lose very many worthy risks, both to the company and to the agent taking the application. Having power and facility to examine such risks with a view to bringing out in each individual case its peculiar circumstances, we are willing that any and all cases may be sent to us freely by agents soliciting in their respective fields, and we agree to give each case a thorough and impartial examination regardless of its past record. It must be distinctly understood that we do not agree that this association should be put to the cost of a medical examination until we have passed upon the risk as submitted in each individual case, and have given our consent that the applicant should pass before our examiner under the ordinary rules of the association. Fill out one of the blank applications of the association as closely as possible from your knowledge of the case, and from ques-

tions made to the applicant, and after your examination into the merits of the case, we will instruct you as to its standing. We can not consent to do this in any other territory than in this, our own State, but in this we are willing to go to any care to clear up risks." Letter dated Sept. 2d, 1894, from James G. West, president, to W. S. Green: "Enclosed we hand you our circular showing rates for our annual rate policy. Our policy form will conform to this. The first and second payment not being in same. This policy will help you in many cases to get an application which because of the admission fee charged you could not. Glad to hear from you always."

M. J. Moses testified, that a short time prior to the death of McArdle he had a conversation with West, the president of the defendant company, in Atlanta. The substance of the conversation was as follows: "He stated that he had received some applications from Columbus, and mentioned, among others, the name of Mr. McArdle. That is, to the best of my knowledge and belief, what impressed me. I represented some other company, and did not consider the matter. To the best of my recollection and belief, that he had Mr. McArdle and Mr. Farley; don't remember who else. I said, 'How did you come to take Mr. McArdle's application?' and he said, 'Why, he stood a beautiful examination,' and brought me the examination-papers, and made reference to Mr. Farley — think it referred to Mr. Farley as reference. It seems to me he asked me if I knew Mr. Farley, and I said, 'Yes, he is Mr. McArdle's son-in-law.' I told him that I would not accept Mr. McArdle because I did not consider him a good risk. I told him that I had been informed that he had been rejected by other companies. To the best of my recollection and belief, this conversation occurred about three months prior to Mr. McArdle's death."

1. Whatever may be the rule with respect to that question in other jurisdictions, it is now, by the settled course of judicial opinion in this State, the established law, that representations contained in an application for insurance, though incorporated therein and warranted to be true, if they relate to mere immaterial matters, do not avoid a policy of insurance. In reviewing and applying the principle discussed in the case of *Southern*

*Life Insurance Company* v. *Wilkinson*, 53 *Ga.* 535, this court, through Bleckley, J., in the case of *Mobile Fire Department Insurance Company* v. *Coleman*, 58 *Ga.* 255, uses the following language, which we here quote for the purpose of showing that there is no such magic in a contract of insurance as to take it out of the ordinary rules which govern the construction of contracts between parties touching other matters: "So much of this case as turned upon dealing with the subject of materiality, whether of covenant or representation, we think is ruled by 53 *Ga.* 537. The code governs the contract, and the construction of the code is settled, to the effect that what is wholly immaterial to the risk is so utterly immaterial that the yea or nay of it will not render the policy void. If this be the true meaning of the code, even an express stipulation by the parties that the validity of the policy shall depend on immaterial as well as material matters, is, at bottom, an attempt to repeal the law. Such a stipulation is itself immaterial, in the sense of being idle and nugatory. The code, instead of relegating to the parties the subject of materiality, holds possession of it for rational and honest adjudication by the tribunals of the country. Whoever makes a contract of insurance in this State must submit to have its force and effect governed by the statutory provisions applicable to that class of contracts. There is a public policy involved in standing by substance. Insurance is *business*, and not elaborate and expensive trifling. Of course, what is in any degree material should be allowed its due effect; but the absolutely immaterial should count for nothing." So that we take it as well settled in this State, that every breach of warranty made by a person touching the validity of a contract of insurance will not avoid the policy, even though the contract of insurance specially so provides. The reason why policies of insurance are vacated because of the misrepresentations of facts material to be known is that the law denominates such misrepresentations a fraud upon the insurer, but it is not every case of misrepresentation in the course of negotiations leading up to, or which become incorporated as warranties in, a contract which will authorize the parties to rescind it. It is true our Civil Code, § 2098, provides, "Any verbal or written

misrepresentations of facts by the assured to induce the accep-
tance of the risk, if material, must be true, or the policy is
void." There is, however, another kindred section of the code
(§ 3533) which we will now quote: "Fraud may exist from
misrepresentation by either party, made with design to deceive,
or which does actually deceive the other party; and in the lat-
ter case such misrepresentation voids the sale, though the party
making it was not aware that his statement was false. Such
misrepresentation may be perpetrated by acts as well as words,
and by any artifices designed to mislead. A misrepresenta-
tion, not acted on, is not ground for annulling a contract." It
will be seen that this latter clause of the above-quoted section,
is general; applies to all classes of contracts; and while the
code recognizes the universal rule, that fraud in its procure-
ment avoids all contracts, it further establishes the proposition,
that if the fraud consist of misrepresentations, and such mis-
representations be not acted upon to the prejudice of the par-
ties assuming to perform, then the contract is not thereby
avoided. The difficulty with the defendant in the present case
has been, that the agent who acted for it in procuring the as-
sured to take the policy has not been given by it the station to
which, by reason of his position with reference to the defend-
ant and its contract of insurance, he is entitled. The defend-
ant has treated him as an "agent of work only," and "ignored
him as an agent of thought." One who solicits insurance, and
represents the company in conducting the negotiations which
lead up to the execution of the contract and subsequently in
the delivery of the contract itself, is the general agent of the
company with reference to that particular contract. Relative-
ly to it, he is as much the alter ego of the company as any other
corporate officer. When it delegates to him the authority to
take insurance, and to negotiate for the company in making
its contracts of insurance, it likewise impresses him with all of
the responsibilities which the law will attach to a person in his
situation; and the decision of this court in the case of *Clubb*
v. *American Accident Co.*, 97 *Ga.* 502, following the decision in
the case of Insurance Co. *v.* Wilkinson, 80 U. S. 222, holds,
that where such an agent himself undertakes not only to solicit

the insurance but likewise to prepare the application of the assured, he is the agent of the company with respect to both matters.   Assuming then that misrepresentations were made by the assured in the present case, which were covenanted to be true, yet such misrepresentations, according to the testimony of the agent himself, were known to be untrue at the time the application was made.   We will hereafter consider whether the principal is chargeable with notice of facts which came to the knowledge of the agent before the agency was created.   Assuming for the present that it is so charged, the local agent, Green, who solicited this insurance, and who himself prepared the application and procured the assured to sign it, had full knowledge at the time that he had previously been rejected by other insurance companies because of ill health.   It is true the assured, in his application, stated that he had been rejected by only one insurance company; but the agent, according to his own testimony, knew at the time that he had previously been rejected by several.   The agent had knowledge of the cause of the rejection; possibly not of the specific physical ailments with which the assured had previously been afflicted; but certainly, when he knew that the assured had been rejected by other companies because of ill health, he was put upon inquiry as to the specific cause of the rejection, and the law would charge him, as against his principal, with knowledge of such facts as he might have discovered had he prosecuted with reasonable diligence the inquiry suggested by the facts which were known to him.   If the facts represented to be true were not true, and their falsity was known to the agent, he could not have been induced to enter into the contract of insurance in consequence of such false statements, for it was impossible for him to have been misled by them.   If he were not so misled to his prejudice, then there is direct code authority for the proposition that the contract will not thereby be avoided.   We are in the present case relieved of the difficulty which sometimes occurs in policies of insurance in which it is stipulated that the policy should be void if any fact covenanted to be true should prove to be untrue; for, in the present case, while the covenants of warranty extend to the truth of the facts, there is

nothing in the policy itself which provides that a breach of such covenants should result in avoiding the policy. There was no express contract contained in the policy to the effect that it should be void if the facts warranted to be true should prove untrue. The insurer was not induced to enter into the contract of insurance because of any fraud practiced upon it by the assured, for the reason that even if the facts stated to be true were in fact untrue, this latter fact was entirely within the knowledge of the agent of the company; and inasmuch as such misrepresentations do not have the effect to avoid the contract, if the insurer has been injured in consequence of any breach of warranty by the assured, it would be remitted to its action for such breach of warranty, and would not be entitled to treat the contract itself as having no binding force upon it. Aside from these considerations, where the insurer, with a full knowledge that false representations were made at the time the application for insurance was filed, nevertheless accepted the risk and issued the policy, it would be held to have waived a breach of such a warranty as affecting its liability upon the policy; for if the warranty existed by virtue of the representation and the covenant of its truth, there was an immediate breach of it within the knowledge of the insurer, and if with a knowledge of a breach of warranty it nevertheless undertook to insure the assured, it certainly could not be heard to set up such precedent breach of warranty to excuse its liability upon its contract of insurance.

2. Error is assigned upon the refusal of the court to instruct the jury to the effect, that knowledge of such facts only would be imputed to the principal as came to the knowledge of the agent after the creation of the agency, while about the business of the principal and in respect to that business; and that if the agent had knowledge of facts which was acquired prior to undertaking the transaction or agency, then such knowledge would not be imputed to the principal. Corporations are unlike individuals in one respect. They can acquire knowledge only through the medium of agents; they can contract only through the medium of agents; and therefore, if the agent be competent to contract, he is competent to acquire knowledge for the

47

corporation for and on whose behalf he does contract. So far as knowledge or notice which is acquired during the agency is concerned, and while engaged in and about the business of the principal with respect to the particular matter to which the knowledge relates, it is a rule of universal acceptance that such knowledge is imputable to the principal in the same manner and to the same effect as though it had been communicated to or acquired by him in person. Mechem on Agency, § 720. This is not the only knowledge, however, which will be imputed to the principal; for under certain conditions and limitations, which will be hereinafter stated, knowledge acquired by an agent prior to the time he entered upon the service of the principal will be imputed to the principal. The rule with respect to this subject is so clearly stated in the work of Mechem on Agency, § 721, that we take the liberty of quoting from it as follows: "The law imputes to the principal, and charges him with, all notice or knowledge relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority, or which he may previously have acquired, and which he then had in mind, or which he had acquired so recently as to reasonably warrant the assumption that he still retained it; Provided, however, that such notice or knowedge will not be imputed; 1. Where it is such as it is the agent's duty not to disclose, and, 2. Where the agent's relations to the subject-matter, or his previous conduct, render it uncertain that he will not disclose it, and, 3. Where the person claiming the benefit of the notice, or those whom he represents, colluded with the agent to cheat or defraud the principal. The rule does not depend, in either case, upon the fact that the agent *has* disclosed the knowledge or information to his principal; subject to the exceptions named, the law conclusively presumes that he has done so, and charges the principal accordingly. What present knowledge, previously acquired, may reasonably be attributed to the agent, is a question to be governed by the facts of each particular case. 'It may fall to be considered,' said Lord Eldon, 'whether one transaction might not follow so close upon the other as to render it impossible to give a man credit for having forgotten it.

I should be unwilling to go so far as to say, that, if an attorney has notice of a transaction in the morning, he shall be held in a court of equity to have forgotten it in the evening; it must in all cases depend upon the circumstances.' " So Mr. Justice Bradley, in the case of Distilled Spirits, 11 Wall. 367, states the rule to be: "So that in England the doctrine seems to be established, that if the agent, at the time of effecting a purchase, has knowledge of any prior lien, trust or fraud affecting the property, no matter when he acquired such knowledge, his principal is affected thereby. If he acquire the knowledge when he effects the purchase, no question can arise as to his having it at that time; if he acquire it previous to the purchase, the presumption that he still retains it and has it present to his mind, will depend on the lapse of time, and other circumstances. Knowledge communicated to the principal himself he is bound to recollect, but he is not bound by knowledge communicated to his agent, unless it is present to the agent's mind at the time of effecting the purchase. Clear and sat-. isfactory proof that it was so present seems to be the only restriction required by the English rule as now understood. With the qualification that the agent is at liberty to communicate his knowledge to his principal, it appears to us to be a sound view of the subject." In the case of Fairfield Savings Bank v. Chase, 39 American Reports, 319 (72 Me. 226), Mr. Justice Peters, speaking for the Supreme Court of Maine, states "the safer and better rule to be, that the knowledge of an agent, obtained prior to his employment as agent, will be an implied or imputed notice to the principal, under certain limitations and conditions which are these: the knowledge must be present to the mind of the agent when acting for the principal—so fully in his mind that it could not have been at the time forgotten by him; the knowledge or notice must be of a matter so material to the transaction as to make it the agent's duty to communicate the fact to his principal, and the agent must himself have no personal interest in the matter which would lead him to conceal his knowledge from his principal, but must be at liberty to communicate it." In the case of Chouteau v. Allen, 70 Mo. 290, the rule is likewise recognized .

in the following language: "Knowledge acquired not only during the continuance of the agency, but also that possessed by the agent so shortly before as necessarily to give rise to the inference that it remained fixed in his memory when the employment began, binds the principal." Upon this question the courts have not been all of one mind. In the case of Warrick *v.* Warrick, 3 Atkyns, 291, Lord Hardwicke, having the question under consideration, expressed the opinion that the rule which imputed to the principal knowledge of facts known to his agent could not be extended so far as to affect the principal by knowledge of the agent previously acquired in a different transaction. Lord Eldon, in the case of Mountford *v.* Scott, 1 Turner & Russell, 274, in discussing the same subject, uses the language attributed to him in the quotation above made from the text of Mechem on Agency. The Supreme Court of the United States, speaking through Mr. Justice Bradley, in the case of Distilled Spirits, above quoted, says, "The distinction taken by Lord Hardwicke has since been entirely overruled by the Court of Exchequer Chamber in the case of Dresser *v.* Norwood (17 Common Bench, N. S. 466)"; and later in the same opinion uses the following language: "On the whole, however, we think that the rule as finally settled by the English courts, with the qualification above mentioned, is true one, and is deduced from the best consideration of the reasons on which it is founded." In the case of Wilson *v.* Minnesota Farmer's Mutual Fire Insurance Association, 36 Minn. 112, the rule is there stated to be, "Knowledge of a fact received by an agent at a time when he is not acting as such, if actually had in mind by the agent when he subsequently acts for his principal, will, as respects that transaction, be imputed to the principal." See also Constant *v.* University of Rochester, 2 L. R. A. 734.

Supported as the doctrine has been by a majority of the courts of last resort in the several States which have dealt with the question, and as well by the direct approval of the Supreme Court of the United States, we are disposed to and do hold that, subject to the limitations expressed in the quotation which we have hereinbefore made from Mechem on Agency, the principal is chargeable with notice of such facts as came to the knowl-

edge of the agent prior to his entering upon the service of the principal. We have no difficulty in applying that rule to the facts in the present case. According to the testimony of Green himself, at the time he made the application, the facts of which he had acquired previous knowledge were present in his mind. There is no suggestion of a collusive arrangement between himself and the assured. They were dealing at arm's length. He was under no duty to conceal from his principal the facts within his knowledge, and was under no disability to disclose them. We think, therefore, that the facts of the present case bring the question of notice squarely within the rule above stated, and that the trial judge did not err in refusing to give the instructions requested.

3. Even if it be conceded, in the present case, that the action of the company in issuing the policy, after knowledge to its agent who negotiated the insurance of the falsehood of the representations made by the assured, did not amount to a waiver of the breach of such warranties, and even if it be conceded that notice to Green acquired prior to his employment should not be imputed to his principal, under the facts of the present case, we still think the defendant is liable. West was the president of the company; the policy of insurance had already been issued. While the assured was yet in life, in a conversation with Moses, which occurred about three months prior to the death of the assured, Moses, being engaged in the insurance business for other companies and having been advised by West that the defendant company held a risk upon the life of McArdle, the assured, told West that McArdle was a bad risk, and told him that he, Moses, had been informed that McArdle had been rejected by other companies. The policy was issued on the 10th day of August, 1894; McArdle died on April 5, 1895; the annual premium due was $184.80, $40.00 of which was to be paid upon the delivery of the policy, $15.00 sixty days from the date of the policy, the remainder was to be paid in bimonthly instalments of $30.80, payable upon the first day of the months of February, April, June, August, October, and December. The conversation between Moses and West occurred about three months prior to

the 5th day of April, 1895, which was the date of the death of McArdle, which would locate the date of the conversation at about January 5, 1895. The evidence is that the instalments were duly paid; so it follows that at least two instalments, those payable on the 1st day of February and 1st day of April, had been paid by McArdle (and payment of these instalments is admitted by the plea of the defendant) and received by the company after knowledge to West that the facts stated in the application, and which were warranted to be true, were in fact untrue. If these representations warranted to be true were any part of the inducement to the defendant to enter into its engagement, upon learning that they were false it should immediately have repudiated the contract and then offered to rescind. When it accepted the premiums with a knowledge that the representations were untrue, it elected to affirm the contract notwithstanding such untrue representations; and having received from McArdle in his lifetime the money in satisfaction of the instalments due, paid in pursuance of and in accordance with the contract of insurance, it is, after his death, estopped to deny the validity of the contract under which it received his money. In the case of Matt *v.* Roman Catholic Mut. Pro. Soc. of Iowa, 30 N. W. Rep. 799, the rule is stated to be as follows: "An insurance company can not avoid liability for a loss on one of its policies on the ground that the contract was void from the beginning, when, at the same time, it is collecting assessments on such contracts." That court, in discussing the very question which we now have under review, uses the following significant expression: "These certificates are not to be treated as valid for the purpose of collecting assessments, and invalid for the purpose of escaping liability." In respect to the doctrine of estoppel, insurers occupy no better position than others. There is nothing in the contract of insurance itself which renders improper the application of this doctrine where the circumstances authorize it. This court, in the case of *Smith* v. *Estey Organ Company*, 100 *Ga.* 628, in discussing the right of rescission, and the right of one person to be relieved from the obligation of a contract because of fraud in its procurement, uses the following language: "Long de-

lay in the repudiation of a contract into which one is induced to enter in consequence of misrepresentations of another, fraudulently made, is as fatal to the right of rescission as would be express acquiescence in the fraud; the only difference being that in the one case acquiescence implies assent, and in the other, assent must be proven. It is, therefore, that where the purchaser of goods seeks to avoid the contract of purchase on the ground of fraud, he must, upon the discovery of the facts constituting the fraud, at once, upon his first opportunity to do so, announce his purpose to rescind, steadfastly adhere to it, and make or offer to make restitution. If he remain silent or passive, retain possession of the goods received under the contract as his own without complaint until long after the discovery of the fraud, he will be held to have waived any objection to the fraudulent conduct of the seller, and will be bound for the purchase-price as though in the execution of the contract no fraud had been committed." The principle there announced is supported by a long line of decisions, among others in the cases of *Summerall* v. *Graham*, 62 *Ga.* 730–731, and *Hunt* v. *Hardwick*, 68 *Ga.* 104. In the present case, an offer of restitution of premiums was made by the plea of the defendant, but the difficulty with this offer of restitution is that it came too late. The reception by it of the premiums which the contract required the assured to pay, with knowledge that false representations had been made in order to induce the contract, was an approval, in law, of the contract thus made, and operated as an estoppel upon the insurer thereafter to insist upon the invalidity of the policy. To allow it now to recede from its contract would be to permit it, during the lifetime of the assured, to lead him to believe that he was in fact insured, and receive his money, taking the chances of his surviving the life of the policy. Had it rescinded or repudiated the contract when its president discovered the false representations, assuming that under the facts it would have had the right of repudiation, the assured might have taken the precaution to have procured elsewhere insurance upon his life; and to allow it, at this late day, to escape liability upon such a pretext would operate as a gross fraud upon the assured. The law will not pre-

sume that the insurer intended to perpetrate a fraud; but will rather presume, in favor of innocence of an evil intent, that when it failed to notify the assured of its purpose to repudiate the agreement, it intended to waive any breach of the warranty which might have occurred in consequence of the representations made in the application.

4. The court did not err in refusing to give the request which is set out in the 9th ground of the motion. It will be seen that, if the instruction requested correctly stated the law, a policy would be avoided because of a mere omission upon the part of the assured to state a material fact, without reference to the motive by which he was influenced in omitting to make such statement. An omission to state is the equivalent of a failure to state; and by our Civil Code, § 2099, it is expressly provided as follows: "A failure to state a material fact, if not done fraudulently, does not void; but the willful concealment of such a fact, which would enhance the risk, will void the policy." The request under consideration was not adjusted to the section of the code we have just quoted, because if the failure to state the fact was the result of an oversight, or other cause, and was not done fraudulently, it would not avoid the policy. The omission from the request of the word "fraudulently" put it in direct opposition to the code provision above referred to; and it was therefore properly refused by the court.

5. An effort was made in the present case to impeach the contract of insurance, upon the ground that it was issued in consequence of a fraud perpetrated by the assured upon the insurer. The plaintiff offered to and did prove, over the objection of the defendant that such testimony was irrelevant, the good character of the assured. Error was assigned upon the ruling admitting this evidence. We think it was properly received. Our Civil Code, § 5159, provides as follows: "The general character of the parties, and especially their conduct in other transactions, are irrelevant matter, unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct." In the case of *McNabb* v. *Lockhart & Thomas*, 18 *Ga.* 495, which was a suit for the loss of money which had been committed to the custody

of the defendant, it was held that such evidence was admissible, and upon the general subject this court ruled as follows: "In civil cases such evidence is always admissible, when the nature of the action involves the general character of the party, or goes directly to affect it. And whenever a particular trait of character is involved in the matter charged against the defendant, there the character of the party, in that particular trait, is put in issue, and may be given in evidence. We can not doubt that the character of the defendant for want of integrity and trustworthiness was put directly in issue by the action brought against him; and from the very nature of the case, and the difficulties surrounding it, that character must constitute his main, if not his only defense. Entire liberty should have been extended to the defendant upon this point. The time will come, and we are fast verging to it, when the administration of justice, both civil and criminal, will turn very much upon the character of the litigating parties, their testimony being mainly looked to for the establishment of the facts upon which the law will pronounce its judgments." We think the issue in this case involved directly the character of the assured. He was charged with having perpetrated a gross fraud upon the insurance company. Evidence of his good character was admissible to rebut any inference unfavorable to him which might have been deduced from the evidence offered against him.

6. Other than as here ruled, it is unnecessary to consider the other questions made in the record, inasmuch as some of them are of minor importance, and should have no controlling influence upon the judgment of the court, and those which seem to be meritorious are fully disposed of by the direction which we will proceed to give. The jury, upon the trial of this case, awarded damages and attorney's fees against the defendant. We think this was wholly unwarranted by the evidence. The many complex questions of law involved herein, and the solution of which has disturbed this court no little, make a conclusive reply to the proposition that the right of the plaintiff was contested in bad faith, or that it was stubbornly litigious in the premises. Damages and attorney's fees can in no case be awarded where the defendant has any reasonable ground for

contesting the right of the plaintiff. There was such a ground in this case; and accordingly the judgment is affirmed with the direction, that so much of the verdict as allows attorney's fees and damages to the plaintiff be written off, and that the costs accruing in this case since the rendition of the verdict be taxed against the plaintiff, the defendant in error.

*Judgment affirmed, with direction. All the Justices concurring.*