## 26211.   PACIFIC MUTUAL LIFE INSURANCE COMPANY
### v. BARFIELD.

DECIDED NOVEMBER 11, 1937.   REHEARING DENIED DECEMBER 16, 1937.

*Bryan, Middlebrooks & Carter,* for plaintiff in error.

*Harold Hirsch, Marion Smith, Welborn B. Cody, Edwin L. Cody,* contra.

BROYLES, C. J.   Dr. Joseph Rex Barfield filed suit in the municipal court of Atlanta, Fulton section, for $2500, besides interest, against the Pacific Mutual Life Insurance Company, on a policy of insurance providing for monthly disability benefits.   The defendant's demurrer was overruled, and on this ruling and the exceptions pendente lite thereto the defendant assigns error.   The jury rendered a verdict against the defendant for the full amount sued for.   A motion for new trial was overruled, and the defendant excepted.   The demurrer was on the ground that "the petition shows on its face that the municipal court of Atlanta, Fulton section, has no jurisdiction, inasmuch as the total sum shown by the plaintiff's petition to be due plaintiff on the date of the filing of the petition exceeds $2500, exclusive of interest and costs."   The petition alleges "that under the terms of said contract monthly disability payments in the sum of $250 have matured since March 4, 1935, up to the date of the filing of this suit.   With respect to amounts which have become due and payable to the plaintiff up to and on the date of filing this suit, the plaintiff hereby waives and renounces any right to recover on account of said sums any amount in excess of $2500, and interest thereon, for which amount this suit is filed."   The right to recover payments due after the filing of the suit was not waived.   The plaintiff made this waiver in order to give the municipal court jurisdiction of the case.   It is declared in Ga. L. 1925, p. 372, sec. 10, that "said municipal court of Atlanta, Fulton section, shall have concurrent jurisdiction with the superior courts of Fulton County and the city court of Atlanta over the entire County of Fulton  .  .  where the amount *sued for*

44

. . is not more than $2500 principal, exclusive of attorney's fees, interest, and costs." (Italics ours.) There is a vital distinction between an amount which may be owing and the amount *sued for*. It is the latter which determines the jurisdiction of the municipal court of Atlanta. The plaintiff in error cites several cases dealing with the jurisdiction of justices' courts. The Code, § 24-1001, fixes the jurisdiction of justices' courts by "the principal sum claimed." In the municipal court it is "the amount sued for," which may be all that is claimed to be due or less than is claimed to be due. The amount sued for in the instant case is not liquidated, because the plaintiff's recovery would depend upon the number of months he was disabled; and since there is no agreement that he was disabled for any particular month or months, his disability for each month sued for must be established by proof satisfactory to the jury, and therefore the amount sued for is unliquidated. In *Jennings* v. *Stripling,* 127 *Ga.* 778 (56 S. E. 1026), cited by the plaintiff in error, the plaintiff brought suit in a justice's court. "Attached to the summons was a statement of the alleged cause of action, in which $100 was set forth as damages for the breach of a contract. Following this was an itemized statement showing damages in different amounts, resulting from various causes, the aggregate amount being $132.50. Following this statement were these words: 'To amount written off and unclaimed, to bring case within J.P. jurisdiction, $32.50.' *Held,* that the suit was within the jurisdiction of the justice's court." In the opinion it was said: "When the amount is not fixed, either by agreement or by the law,—that is, in a case where the damages are unliquidated,—and the amount, in either event, is finally left to the determination of a jury, under all the circumstances of the case, the plaintiff *is not bound to claim all of his damages,* but may claim such only as he sees proper; and, if the amount claimed is within the jurisdiction of a *given court,* the defendant can not defeat the suit by showing that his wrongful conduct was more injurious than the plaintiff saw fit to allege." (Italics ours.) In the instant case the question of which months and how many months the plaintiff was disabled, and consequently how much money was due him, was necessarily "finally left to the determination of a jury." See, in this connection, *Reliance Life Ins. Co. v. Capital National Bank,* 38 *Ga. App.* 349 (143 S. E. 924); *Fire-*

men's Ins. Co. v. Oliver, 53 Ga. App. 638, 641 (186 S. E. 706);
Edwards v. Edwards, 163 Ga. 825 (137 S. E. 244). The court did
not err in overruling the demurrer.

In the trial the defendant company contended that the insurance
contract was void because the plaintiff in his application for the
insurance gave false answers as to his physical condition; and the
principal evidence offered by the defendant in support of this con-
tention was that the plaintiff had applied in 1927 to the United
States Veterans Bureau for compensation on account of disability
originating in the World War in September, 1918, which was be-
fore the application for insurance in the instant case, and that the
plaintiff's statements in his application for Government compensa-
tion in 1927 conflicted with his statements in his application for
this insurance in 1921. A careful examination of the evidence
shows that the jury was authorized to find that the plaintiff con-
cealed nothing from the defendant company in applying for this
insurance, but, on the contrary, told the medical examiner repre-
senting the company all the material facts pertaining to his con-
dition; and the medical examiner, with full knowledge of the facts,
wrote the answers contained in the application for insurance.
There is evidence to show that both the company's doctor and the
plaintiff, also a doctor, thought the plaintiff was a fit applicant for
insurance, and that there was no intention to deceive the company.
The evidence disclosed that in 1918 the plaintiff, while in the
United States Army, had an attack of influenza in this country
and another attack in France; that he was discharged from the
army, *without any disability,* in April, 1919; that he then resumed
his practice of medicine, and in August, 1921, after being dis-
charged from the army without disability and after practicing his
profession for two years and four months, he applied for the in-
surance on which this case is based; that in 1927, six years after
he took out this policy of insurance, he applied for compensation
from the Government; and that in November, 1934, *more than
thirteen years after he took out the policy of insurance in this case,*
he filed his claim for disability thereunder. That the present dis-
ability resulted from the attacks of flu which the plaintiff had while
he was in the army may or may not be true; but there is evidence
to show that neither the plaintiff nor the insurance company's doc-
tor thought the plaintiff was physically unfit *at the time the appli-
cation for this insurance was filed.*

The following evidence of the plaintiff shows that he informed the company's medical examiner about his previous illness while he was in the army; and that he did so inform the company's medical examiner *is undisputed and uncontradicted by any testimony:* "I stated to the company's medical examiner that I was in good health at the time I signed the application, in so far as I knew.

. . At the time of the examination I was asked if I had any disease of any consequence recently, as I remember the question from Dr. Sage, who was the examiner; and *I told him that I had had the flu and some bronchitis while I was in the service; and we discussed the condition,* and he asked me if I had recovered from it. I told him that I had, in so far as I knew; and he says, 'Well,' he says, 'practically everybody was having the flu along then, and I don't think it amounts to anything.' I told him that I had recovered from any trouble that I may have had in the past, in so far as I knew. I don't recall whether that is all of the conversation between him and me, but we did discuss the flu and the bronchitis. . . *If there was any question pertaining to any other ailment that I may have had, I certainly discussed it.* . . Of course I had the flu in Camp Greenleaf, and also had it again in France, and then I had some bronchitis. *This was discussed at the time of the medical examination.* . . If I was suffering from any disability at that time I wasn't aware of it. As to whether I regarded the influenza that I had in 1918 as a temporary trivial trouble—I thought I had entirely recovered from it. . . I left the army, being discharged without disability, and took up the normal practice of medicine. . . Dr. Sage filled in the application [for this insurance], and I signed it. . . I told him about these flu attacks, and gave him the same information that I gave defendant's counsel in answer to those questions. . . *At the time I took this policy of insurance I thought I had entirely recovered.* . . It was along in 1927 that I *first connected* the difficulty that I developed at that time with the illness that I had in the army. . . In 1927 and along there I was advised by some of my friends in the medical profession that I should get my case before the Government, they stating, 'We know, perhaps, things relative to your physical condition that you haven't thought of, haven't had a chance to go into,' so I made this application [for Government compensation]. . . It is not a part of the prac-

tice of physicians to tell the patient he has got high blood pressure. . . I worked on until the first part of November, 1934; but of course it was becoming more difficult all along."

Dr. Shanks, who, according to the testimony, examined the plaintiff casually in 1919 and thoroughly in 1927, and who tried to help the plaintiff procure compensation from the Government, testified: "I think I took his blood pressure first soon after the war in 1919. I don't remember when I first examined his heart, but I think it was about the same time. . . Some of those things that you refer to should not be considered as examinations, because they were—taking his blood pressure was a casual affair; he would drop by my office, and maybe I would take his, and perhaps he would take mine, just something that is done by all doctors; we do that frequently. . . I think my first examination showed a blood pressure around 160 or something like that. . . I never went into Dr. Barfield's history until about 1927, when he applied for compensation from the Government, although I had done some of those things beforehand. I thought my examination of his blood pressure in 1919 was accurate enough to base a letter to the Government on, or to anybody else, 'to whom it may concern.' . . When I took his blood pressure *I would not tell him what I found.* I rarely ever tell a patient about their blood pressure. A doctor would be the last person I would tell." (Italics ours.) As to Dr. Shanks' examination of the plaintiff before his application for this insurance, and the plaintiff's answer to the question in this regard in the application, it is well settled that such a question relates to "some illness or diseases of substantial importance or of a serious nature" (*Federal Life Insurance Co.* v. *Summergill,* 45 *Ga. App.* 829, 166 S. E. 54), and at that time the plaintiff was pursuing his regular occupation and was not considered seriously ill by any one. The casual examination by Dr. Shanks in 1919 was not for such an illness as the law contemplates, and the plaintiff so treated it in his answer in the application. From the foregoing evidence the jury was authorized to determine that though the plaintiff in 1927 may have traced his then illness to the sickness he had while in the army, *he did not know this when he applied to the defendant company for this insurance* in 1921. Neither did Dr. Sage, the company's medical examiner, know it, though, according to the undisputed evidence, he had all the information

that the plaintiff had relative to the plaintiff's illness in the army, and made a thorough physical examination of the plaintiff. The plaintiff paid the premiums on this policy of insurance for more than thirteen years before asking for any disability payments thereunder; and the company accepted the premiums during these thirteen years, and never raised any question as to the truth of the plaintiff's answers contained in his application until the plaintiff asked for payment because of his disability. There was evidence which would have authorized a verdict for the company had the jury seen fit to accept it; but where the evidence on questions of fact is conflicting, it is for the jury, and not for the court, to pass upon its credibility. So far as the record discloses, the defendant made no motion for a directed verdict, which would at least indicate (though not conclusively) that the defendant recognized that the evidence adduced presented an issue of fact to be passed upon by the jury.

Assuming that the plaintiff's testimony in this case conflicted with his statements to the veterans bureau, the jury was authorized to accept the explanation offered by him as to the admissions made, or to accept his testimony in preference to these admissions. "The party against whom an alleged admission is shown may introduce evidence to explain the statement and thus diminish its weight as an admission." 22 C. J. 419. And "the ultimate determination as to the weight of an admission is for the jury." 22 C. J. 426. See *W. & A. R. Co.* v. *Tate,* 129 *Ga.* 526 (4) (59 S. E. 266); *Burk* v. *Hill,* 119 *Ga.* 38 (45 S. E. 732); *Graham* v. *Owens,* 18 *Ga. App.* 284 (3) (89 S. E. 304); *City of Atlanta* v. *Sciple,* 19 *Ga. App.* 694 (2) (92 S. E. 28); *Webb* v. *Watkins,* 20 *Ga. App.* 436 (5) (93 S. E. 108). Even regarding the contradictory statements as a matter of impeachment, it was still for the *jury* to say whether the plaintiff was successfully impeached. Code, § 38-1806. Where an applicant for life or disability insurance represents in good faith that he is in sound health, the policy will not be avoided by reason of the fact that he had a serious physical defect which *at that time* was not manifested and which did not become known to the applicant until several years later. In *National Life &c. Co.* v. *Lee,* 46 *Ga. App.* 4 (166 S. E. 253), the court held: "While the evidence tended to show that the insured had tuberculosis in an advanced stage about two months after she applied for the insur-

ance, she having stated in her application that she was in sound health, the jury were authorized to find, from the evidence, that she was in apparent good health and did not know that she had this malady *at the time of her application* for the insurance and acceptance of the policy, and that she made the application and accepted the policy in good faith." (Italics ours.) Though the insured may have been sick several years before applying for the insurance, if he was apparently in good health at the time he applied for the insurance, and made his application in good faith, and told the company's medical examiner about this previous illness, and passed a thorough physical examination given by the company's medical examiner, the insurance policy will not be avoided because of such previous illness. There was ample evidence to show that the plaintiff in the instant case did not know that he had any physical derangement or impairment "at the time of his application" for this insurance. See *National Life &c. Co.* v. *Smith,* 34 *Ga. App.* 242 (129 S. E. 113) ; *National Life &c. Co.* v. *Martin,* 35 *Ga. App.* 1 (2) (132 S. E. 120) ; *Guaranty Life Ins. Co.* v. *Martin,* 44 *Ga. App.* 545 (2) (162 S. E. 288).

The plaintiff having told the defendant company's medical examiner about the previous attacks of flu and bronchitis, and having given him the same information that he gave the defendant's counsel in answer to the questions propounded, and having discussed with the company's medical examiner *any other ailments* that plaintiff may have had where "there was any question pertaining to any other ailments," there was no misrepresentation by the plaintiff, even though later developments showed that the plaintiff had physical infirmities of which he did not know when he made the application for insurance. Moreover, this full discussion between the plaintiff and the company's medical examiner as to the plaintiff's previous physical condition, as was testified to by the plaintiff and uncontradicted by any testimony, was notice to the defendant company as to the plaintiff's previous physical condition. "Any knowledge affecting the rights of the insured, which comes to an agent while he is performing the duties of his agency, becomes *the knowledge of the company.* Therefore any statement relating to the condition of his health, made by the insured, at the time of his application for insurance, to the *physician* entrusted by the company with the duty of making the examination in its behalf

and ascertaining the state of the applicant's health, *would be a statement made to the company."* (Italics ours.) *Fair* v. *Metropolitan Life Ins. Co.,* 5 *Ga. App.* 708 (2) (63 S. E. 812). In *Brown* v. *Mutual Life Ins. Co. of N. Y.,* 29 *Ga. App.* 794 (2) (116 S. E. 559), it was held: "A physician designated by a life-insurance company to examine applicants for life insurance acts as an agent of the company in receiving answers to medical questions propounded to an applicant, and *any information given to the physician* in answer to such questions *is information to the company, although such information did not appear in the application signed by the applicant and the application contained answers giving information to the contrary."* (Italics ours.) Under the foregoing authority the medical examiner of the defendant company was the *agent* of the company to ascertain the physical condition of the plaintiff; and under the undisputed testimony the medical examiner had knowledge of the plaintiff's previous illness. "A policy can not be avoided because of an untrue statement of the insured in his application, of which the insurer had knowledge, and the actual knowledge of the agent who took the application will be imputed to the insurer. *Johnson* v. *Ætna Ins. Co.,* 123 *Ga.* 404 (51 S. E. 339, 107 Am. St. R. 92). The general rule is that notice to an insurance agent, and knowledge obtained by him while acting within the scope of his authority, are notice to the insurance company respecting material facts affecting the risk [citations]. Such company is estopped from asserting the invalidity of the policy at the time it was issued, for the violations of any of the conditions of such policy, if, at the time it was so issued, the fact of such violation was known to its duly authorized agent." *National Casualty Co.* v. *Borochoff,* 45 *Ga. App.* 745, 747 (165 S. E. 905). See also *German American Life Asso.* v. *Farley,* 102 *Ga.* 720, 737 (29 S. E. 615), *Metropolitan Life Ins. Co.* v. *Hale,* 177 Ga. 632 (170 S. E. 875). Under the foregoing authority and the facts of the instant case, the jury was authorized to conclude that the company accepted premiums from the insured for thirteen years with knowledge of the plaintiff's condition as disclosed by the plaintiff to the company's agent, the examining physician, at the time of the application, and that the company now seeks to avoid the policy after accepting the premiums for this length of time.

The defendant contends that the court erred in charging the jury that the provision in the policy that "this insurance does not cover disability resulting wholly or partly, directly or indirectly from bodily injury sustained or sickness contracted while insured is engaged in military service in time of war, bodily injury or sickness caused by war or any act of war," contemplates war subsequent to the issuance of the policy and subsequent to the application, and not some war that happened before the issuance of the policy. It will be noted that the language used is "while the insured *is* engaged." This language, as here used, refers to the future and not to the past, and is equivalent to "shall be." See *Hammond* v. *Buchanan*, 68 *Ga.* 728, 731; State *v.* Boner, 57 W. Va. 81 (49 S. E. 944); P. & W. R. Co. *v.* Yonkers Fire Ins. Co., 10 R. I. 74. Had the defendant intended for this language to apply to the past, it could and should have used such language as "was engaged" or "may have been engaged." A sound reason for this construction is that the insurance company has full opportunity to examine the applicant for insurance, ascertain any physical infirmity that might have been acquired in previous military service, and refuse to insure him if he is physically unfit; while the only method of guarding against liability for disability arising out of future military service is to provide for it in the contract. If the construction contended for by the defendant were applicable, every world-war veteran, who has a policy containing such a provision, would be subject to having his policy avoided if illness could be traced remotely to his service in the world war. Even if the language of this provision were ambiguous, that construction "will be adopted most favorable to the insured" (*Johnson* v. *Mutual Life Ins. Co.,* 154 *Ga.* 653, 655, 115 S. E. 14), and "it will be construed as prospective rather than retrospective." 13 C. J. 532, § 489. The court did not err in instructing the jury that this provision of the policy referred to war subsequent to the issuance of the policy.

The insurance contract provides that "this policy shall be incontestable after one year from its date as to the *time* of the happening of bodily injury or sickness causing disability commencing after such year and while this policy is in force." (Italics ours.) The only reasonable construction of this provision of the policy is that where the disability commenced more than a year after the

issuance of the policy, the *time* of the original sickness which ultimately caused the disability can not be made the ground of contest by the insurer. This gives the insurer a year in which to investigate the answers given by the insured in his application, to investigate his previous and present physical condition, and to contest any claim for disability; and it further protects the company for the reason that any physical ailment which was not disclosed by the applicant, and which might result in disability, would probably cause the disability within a year's time. Even if the language of this provision were ambiguous, it should be construed in favor of the assured. In the instant case, according to the contention of the company, 1918 was the time of the original sickness which ultimately caused the alleged disability; but the plaintiff filed no claim for disability due under this policy until November, 1934, sixteen years after the alleged original cause. Of course if we held that this policy were incontestable, a discussion of the other features of the case would be unnecessary. However, we confine our ruling to the construction of this provision as hereinbefore set out; and in view of our rulings on the other features of the case, we deem it unnecessary to decide whether this "incontestable" clause prevents the defendant from relying upon another provision of the contract, and contesting the validity of the entire contract ab initio on account of alleged misrepresentations by the plaintiff in procuring the contract. Some of the authorities cited by the plaintiff in error are differentiated by their facts from the instant case, and some are of other jurisdictions which, though persuasive and argumentative, are not binding on this court. The jury decided the issues of fact in favor of the plaintiff, including the question whether the plaintiff procured the insurance in good faith or with intent to deceive and defraud, and whether the defendant, through its agent, the medical examiner, had notice of the plaintiff's previous physical condition. The evidence authorized their finding, and the court did not err in overruling the motion for new trial.

*Judgment affirmed. MacIntyre and Guerry, JJ., concur.*