## SUPREME CONCLAVE KNIGHTS OF DAMON
### *et al. v.* WOOD.

1. Where an applicant for life-insurance covenants in his application that the statements made to the medical examiner are true, and these statements are made a part of the contract of insurance and form the basis of such contract, any variation in any of them, which is material, whereby the nature or extent or character of the risk is changed, will avoid the policy, whether the statement was made in good faith or wilfully or fraudulently.

2. In civil cases the burden of proof may be carried by a preponderance of the evidence, which is that superior weight of the evidence upon the issues involved which is sufficient to incline a reasonable or impartial mind to one side of the issue rather than to the other.

Argued May 14,—Decided June 8, 1904.

Action on insurance policy.    Before Judge Hodges.    City court of Macon.    November 24, 1903.

The action was on a "benefit certificate" insuring the life of Arthur L. Wood.    The defense was that he had warranted as true certain statements made by him, as the basis of the contract of insurance, which were untrue.    The material parts of his application for insurance are as follows:    "I, A. L. Wood, having become acquainted with the objects of your Order, do hereby petition for a 2 Degree Class B membership in your Conclave, and do declare, upon my honor, that the statements made by me, subscribed herein, are each and every one of them true. . . I do hereby consent and agree that any untrue or fraudulent statement made above or to the medical examiner, or any concealments of facts by me in this petition, shall forfeit the rights of myself, my beneficiaries, and my family or dependents to all benefits and privileges in this Order. . . I agree and covenant that any benefit certificate that may be issued to me shall be null and void if any of the statements made by me herein or to the medical examiner are untrue, or if any material fact or circumstance respecting my health, habits, family history, or other matter in this petition embraced or enquired of, be concealed, misrepresented, or withheld by me, or not fully and truly stated herein, or if my age be incorrectly stated herein. . . The accompanying statement by me to the medical examiner is made by me as a part of this petition, and I hereby covenant that the same is true."    The material parts of the accompanying statement to the medical examiner are as follows:    "Have you ever been subject to or had any of the following disorders or diseases ?    Answer yes or no to each.    Disease of the heart ?    Answer: No. . .    Have you personally consulted a physician, been prescribed for or professionally treated for sickness or accident in the past five years ?    Answer: Yes.    If so, give dates and duration of diseases.    Answer: Five years ago, for sprain of ankle.    Name and residence of the physician ?    Answer: H. J. Williams. . . I do declare that I am the person who has

made written application for membership in the Knights of Damon, dated Dec. 30, 1901, that I am temperate in my habits, and am to the best of my knowledge and belief in sound physical condition and a proper subject for life-insurance." This was signed by the applicant. The benefit certificate was issued December 31, 1901. It states that it is issued "upon condition that the statements made by said person in the petition for this membership in said Conclave, and the statements certified by the said petitioner to the medical examiner, both of which are filed in the Supreme Secretary's office, be made a part of this contract." Wood died November 23, 1902. The notice and proof of death contained a statement signed by H. McHatton, M. D., the material parts of which are as follows: "Were you the attending physician of deceased during last sickness, and up to time of death? Answer: Yes. Date of your first visit? Answer: April, 1901. Date of your last visit? Answer: Nov. 23, 1902. Date of death? Answer: Nov. 23, 1902. Duration of illness? Answer: April, 1901, to November, 1902. State the remote cause of death; if from disease, give the predisposing cause, date of the first appearance of its symptoms, its history, and the symptoms during its progress. Answer: Valvular disease of the heart. State the immediate cause of death. Answer: Lack of compensation." These papers were introduced in evidence at the trial.

Dr. McHatton testified: "I am a practising physician. I was consulted by Arthur L. Wood for the first time, April 17, 1901; next, April 22, 1901; next, November 6, 1901; next, November 8, 1901; the next, December 11, 1901; and the next, December 17, 1901. I was consulted by him six times, that is, on the 17th and 22d of April he came to my office, on the 6th and 8th of November I went to his house, and on the 11th and 17th of December he came to my office. I examined him and prescribed for him each time. In treating a person the record on my memorandum book shows the trouble for which I actually gave treatment. In other words, if I see a man with a chronic disease and prescribe for an acute disease, I put it in my record as the acute disease. My record accordingly shows that on the 17th and 22d of April, and on the 6th and 8th of November, I prescribed for influenza, cold. On the 11th and 17th of December I prescribed for him for heart trouble. From that heart trouble he never recovered, it being

the cause of his death. . In my opinion as a physician, Mr. Wood had heart disease on December 31, 1901, this being the same disease of which he died. It is my opinion from his symptoms and examination, when the four visits prior to December 11 were made, that he had heart trouble. I think that he had. heart trouble the first time that I saw him, though I do not remember the exact date. I attended him up to the time of his death. His sickness from December 11 up to the time of his death was one continuous sickness. I made out the proofs of death. . . The facts in them are correctly stated. There was no connection between the sprain of Mr. Wood's ankle from which he suffered and the heart trouble. . . Dr. Williams and I were at one time partners. During our partnership Dr. Williams was Mr. Wood's family physician, the physician they relied on. After Dr. Williams' retirement from regular practice I continued to be the physician. . . I did not inform Mr. Wood during my course of treatment, or at any time, that he had heart trouble. Mr. Wood had no symptoms that he could himself discover. I did not treat Mr. Wood in April for anything but a cold; he probably had the beginning of heart trouble at that time. Valvular disease of the heart is practically, as we come in contact with it, a disease contracted in a lifetime, and usually a disease of considerable duration. I examined Mr. Wood when I first treated him, and he had heart trouble then. That is my impression. My memoranda show, however, the treatment that I gave him for his acute existing condition. On the 11th and 17th of December, Mr. Wood was not confined to his bed, but came to my office on these two days for treatment. I advised Mr. Wood that he was suffering from a temporary indisposition. Mr. Wood was in good condition outside of his heart disease and transient colds, so far as I know. His personal appearance was good and he looked well. I have known Mr. Wood fifteen years, and his character is perfectly good. I found no symptoms of heart disease. By symptoms I mean something the patient himself tells me. By an examination of his heart and the sounds that existed in his heart, I concluded that he had heart disease, these being the signs. I. found these signs probably in April. A sign is something that the physician finds out himself. Heart disease is an incurable disease. Heart disease of the character that Mr. Wood had eventually terminates fatally. . . It is my impres-

sion that when I visited Mr. Wood at his house he was sitting up.
. . It is uncertain and variable when symptoms of such a heart
disease will show themselves. Heart disease does not affect a
man's general strength, his power of resistance, and all that. At
first you go on unchanged, and your condition gradually changes
as the disease progresses. If uncomplicated with other diseases
there would eventually be shortness of breath, swelling. These
symptoms appear during the progress of the disease. As I said
before, I think Mr. Wood had no symptom of heart disease that
he could detect. During the six visits above referred to he had
neither shortness of breath nor swelling

Dr. Little testified: "I was the examining physician for the
Knights of Damon on the policy sued on. I examined Mr. Wood.
I filled in his answers in the paper that you have. I recollect, in
this question ·. . in the examination, I asked him if he had been
professionally treated by a physician, and he answered 'yes,' and
referred to the sprain of his ankle. I stopped the examination
there and examined his ankle, and made the memorandum, and
he spoke of Dr. McHatton as being his family physician, and
having incidentally seen him. The answers were so evidently
immaterial that I did not put them in. During the examination
for this insurance I examined his heart, and from my examination
he did not have heart disease at that time. The examination
then made was to consider all symptoms as answered by Mr.
Wood, and all signs that I could detect. Whether a person has
heart disease or not depends upon certain physical signs and
symptoms. These questions here would cover the symptoms of
heart disease. His answers were invariably 'No.' By these symp-
toms, shortness of breath, cough, occasional hemorrhage, œdema,
swelling under the eyes, and sometimes about the ankles. . .
There are certain relative sounds known as healthful sounds, nec-
essary sounds for the heart to act. A deviation from these
sounds would show a diseased condition of the valve. Now, if·
the valve was diseased at this time, these valves would have
shown it, by putting the ear to the chest and listening for the
sound. If the heart was diseased at this time, it should have
shown some relative increase in size. The heart was normal in
its size, the sounds appeared normal, and the action of the heart
was normal, with a pulse of 74 sitting and 80 standing. I failed

to recognize any heart trouble.    The heart is held in suspension by the blood vessels; it hangs by these blood vessels, and if diseased it will sink lower in the chest.  · It beats against the chest wall, if normal, in the fifth interspace, about an inch below and about an inch to the inner side of the nipple, and that is about where the heart beat in this case. . . Dr. Winchester was the Supreme Medical Examiner, and acted on that paper that I filled out.    He knew nothing but what was on the paper.    In the earlier stages of heart disease there are no clearly defined symptoms.    A man may have a symptom sometimes, and then may be better.    They can be more easily detected at some times than at others.    If I had known that a physician several times attended a person and examined him and had expressed the opinion that he had heart disease, I would have suspended the examination for the time and repeated it afterwards.´    The authorities cite cases where in the earlier stages of heart disease, when a man has not taxed his strength and has had nothing to fluster or excite him, there may be nothing in his heartbeat to suggest heart disease, and nothing to lead you to discover it.    I have never seen such cases.    I would say from my examination that he did not have heart disease in 1901.    There was no indication of any heart trouble, and therefore I would not answer that he had heart disease.    I could not answer that it was impossible for him to have had it at that time. . . My opinion is based entirely upon my one examination.    As to my memory of what Mr. Wood told me of having seen Dr. McHatton and consulted him, I can not remember any of the particulars.    I did not regard it as material."
The plaintiff testified that Mr. Wood was her husband ; that she was constantly with him during his sickness; that during that period he did not suffer from shortness of breath, and there was no swelling; that when Dr. McHatton came to see him, he was sitting up and just had a bad cold. , The witness, when asked how long after the policy was issued before he really got sick, said it was in June, 1902; he had not been in bed before June. He was up after that, and then was in bed only seven weeks before his death.

The court gave in charge to the jury Civil Code, § 2099 ; and also instructed them that if Wood had heart disease and did not know that he had it, the failure on his part to disclose it

would not avoid the policy.    There was a verdict for the plain-
tiff.    The defendant's motion for a new trial was overruled, and
it excepted.    In the motion it was alleged that the court erred in
giving the instructions just mentioned, and others of similar im-
port; in allowing Dr. McHatton to testify that he did not inform
Wood that he (Wood) had heart trouble, and advised him that his
indisposition was temporary; in allowing Dr. Little to testify that
Wood gave him certain information in regard to one of the ques-
tions asked in the paper known as "Statements to Medical Exami-
ner," in examining him for insurance, and that the information be-
ing considered immaterial by Dr. Little, it was not recorded in the
paper as part of the answer to the question; also that the court
erred in allowing Mrs. Wood to testify that during Mr. Wood's
illness he did not suffer from shortness of breath    The instruc-
tions referred to the second division of the following opinion were:
(*a*) "The burden of proof is upon the defendants to establish to a
moral and reasonable certainty, by a preponderance of evidence in
the case, the defense upon which they rely to overcome the prima
facie case which they have admitted in favor of the plaintiff.
Moral and reasonable certainty is all that can be expected in legal
investigations.    In all civil cases the preponderance of the testi-
mony is considered sufficient to produce mental conviction.    You
will observe, from the reading of our statute, that the defendant
is not required to establish the defense beyond a reasonable doubt.
They are not required to demonstrate to a mathematical certainty,
as you would demonstrate a mathematical proposition, the truth
of the affirmative defense they have set up to overcome the prima
facie case they have admitted in favor of the plaintiff, but they
are required to show, to a reasonable and moral certainty, by a
preponderance of evidence in the case, the truth of the affirmative
defense which they have pleaded to overcome the prima facie case
in favor of the plaintiff which they have admitted by their con-
tentions." (*b*) "If the contentions of the defendants in the case are
sustained as true, from a consideration of the evidence in the case,
by a preponderance of the evidence, that is to say, to a reasonable
and moral certainty which I have defined to you, it would be
your duty to find in favor of the defendants upon the pleadings,
upon their plea, the defendants then having carried the burden of
proof which the law places upon them in this case.    Bear in mind

that in order to sustain the contentions made by them, the defendants must carry the burden of proof and establish by a preponderance of evidence in the case the truth of their contentions. If after a consideration of the evidence you are not satisfied to a moral and reasonable certainty, and by a preponderance of the evidence in the case, of the truth of the contentions of the defendants upon which they rely to overcome the prima facie case admitted in favor of the plaintiff, it would be your duty to return a verdict in favor of the plaintiff."

*E. P. Mallary* and *Hall & Wimberly*, for plaintiffs in error, cited Civil Code, §§ 2097, 2098, 5145; *Ga. Rep.* 53/535 (10), 549; 58/251, 425–6; 102/143, 720; 22 Wall. 52–3; 91 U. S. 510; 104 U. S. 199, 202; 111 U. S. 339; 188 U. S. 728; 107 Fed. 402; 6 Fed. 672; 8 N. E. 654, 656–8; 74 Ill. App. 482; 26 N. E. 230; 13 Atl. 932; 9 Atl. 766; 50 Vt. 630; 12 Wkl. Notes Cas. 76, c. in 28 Am. Dig., Cent. ed., sec. 687 (K).

*Davis & Turner* and *Hardeman & Jones*, contra. Change of common law by Code: Civil Code, §§ 2089, 2097–8–9, 2101; 1 May on Ins. (4 ed.) § 14, A, 29, B (3), 183, 184, 201; 16 Am. & Eng. Enc. L. (2d ed.) 933; 19 How. 318. Leave asked to review 106 *Ga.* 461. An insurance policy can not, by attempting to contract for warranties, repeal the law, so far as statements of facts, their materiality, and bona fides are concerned; warranties and representations will be construed with reference thereto: 53 *Ga.* 535; 58 *Ga.* 251, 255, 256 (2); *Id.* 420; 80 *Ga.* 224; 102 *Ga.* 720 (1), 733; 98 *Ga.* 760; 107 Fed. 402 (3); Kerr, Ins. 322, n. 3. The statements in the application were not warranties: 1 May on Ins. (4th ed.) § 156, 158, 159, 160, 161, 162, 165, 166, 170, 171, 181, 183; 16 Am. & Eng. Enc. L. (2d ed.) 919 (9), 923, 924, 925, 928; 97 *Ga.* 44; 102 *Ga.* 256, 277; 104 *Ga.* 77; 107 *Ga.* 121, 297; 120 U. S. 190; 21 *Ga.* 1; 30 *Ga.* 717; 84 *Ga.* 348; 102 *Ga.* 143; 60 Am. R. 112; 111 U. S. 333; 107 Fed. 402 (2); 37 Am. St. R. 365. Warranty was of good faith in answering: 1 May, Ins. (4th ed.) § 161; Elliott, Ins. 108, 109; 107 Fed. 402 (2 and 3); 111 U. S. 335; 188 Ill. 133; 59 O. St. 45; Civil Code, § 2098. Omission from written answers of statements made to medical examiner: Civil Code, §§ 2099, 2101; 1 May, Ins. (4th ed.) §§ 161, 186; 102 *Ga.* 720, 733; 53 *Ga.* 536 (7); 107 Fed. 402 (3); Elliott, Ins. §§ 92, 93;

Kerr, Ins. 340 ; 19 Am. & Eng. Enc. L. (2d ed.) 662 ; 65 Mich. 306 ; 70 Vt. 477 ; 85 Ill. App. 143 ; 100 Fed. 719 ; 8 Am. St. R. 894; 25 Am. R. 182; 112 U. S. 250. Moral and reasonable certainty, correct rule :    79 *Ga.* 67.

SIMMONS, C. J.   The courts of the United States and of several of the States have for several years been trying to get away from the earlier decisions in regard to warranties in insurance policies. All of the earlier decisions, so far as we are aware, hold the insured bound by the strict law of warranty, whether the statement warranted be material or not, holding that the parties had the right to agree that a representation was material, though in fact it was not.   Latterly some of the courts have strained to construe the statements of the insured as representations wherever they were not unequivocally made warranties.    Thus it has been held, that where in the application certain statements were covenanted to be true, if the policy or contract did not declare them to be warranties but referred to them as representations or statements, they would be construed as mere representations, so that, if immaterial, their falsity would not avoid the policy.   See Moulor *v.* Ins. Co., 111 U. S. 335 ; Phœnix L. I. Co. *v.* Raddin, 120 U. S. 183 ; Northwestern Mut. L. I. Co. *v.* Woods (Kans.), 39 Pac. 189 ; Alabama Gold L. I. Co. *v.* Johnson, 80 Ala. 467.   But the courts in this State are not troubled with these finer distinctions and strained constructions.    Mr. T. R. R. Cobb, the great lawyer and codifier, who incorporated the principles of law and equity into our code, doubtless saw the great injustice and hardship to the insured under the earlier decisions of the courts.   It was to change this, we apprehend, that he, in 1860, placed in the code which was adopted in 1863 what are now sections 2097 and 2098 of the Civil Code.    These sections are as follows:    2097. "Every application for insurance must be made in the utmost good faith, and the representations contained in such application are considered as covenanted to be true by the applicant.   Any variation by which the nature, or extent, or character of the risk is changed, will void the policy."   2098. "Any verbal or written representations of facts by the assured to induce the acceptance of the risk, if material, must be true, or the policy is void.    If, however, the party has no knowledge, but states on the representations of others, bona fide, and so informs the insurer, the falsity of the information

does not void the policy." Thus it will be seen that a policy can not now be avoided upon the ground of the falsity of a representation, though warrantied, unless that representation be material and the variation from truth be such as to change the nature, extent, or character of the risk. So this court has uniformly construed these sections, as far as we can ascertain. Wherever an applicant for life insurance makes material representations in his application or examination, and covenants that they are true, under the above section of the code, and these representations are made the basis of the contract of insurance, such contract is void if the representations vary from the truth in such manner as to change the nature, extent, or character of the risk. This is true although the applicant may have made the representations in good faith, not knowing that they were untrue. *Southern L. I. Co.* v. *Wilkinson*, 53 *Ga.* 535; *O'Connell* v. *Supreme Conclave Knights of Damon*, 102 *Ga.* 143; *Morris* v. *Imperial Ins. Co.*, 106 *Ga.* 461. The representations when made, if material, are warranties under the code, but they differ from the ordinary warranty in that their falsity does not avoid the policy unless they are material and the variation from truth is such as to change the nature, extent, or character of the risk. It is therefore immaterial whether the warrantor acted in good faith in making them. If one sell another a horse and warrant the soundness of the animal, he is bound by the warranty, whether at the time of the sale he knew or did not know that the animal was diseased. So too, if an applicant for life insurance inform the insurance company, by a written answer to a question as to whether he has had heart disease, that he has not had it, such answer being covenanted in his application, he is bound by his covenant without regard to his good faith in making the representation. Such was the present case. The representation was certainly a material one, and doubtless the company acted upon it. It is scarcely conceivable that the company would have issued the policy if the applicant had answered that he was or had been afflicted with heart disease, or even if he had answered doubtfully. We think that if the answer made was untrue, the plaintiff below can not recover. In reading the brief of evidence we find that the testimony was conflicting as to whether the insured was or had been afflicted with heart disease at the time of his application for insurance. The

physician who treated him testified that in his opinion the appli-cant was at the time afflicted with the disease.   The company's physician, who made an examination at the time of the applica-tion, testified that in his opinion the applicant had at that time no sign or sympton of the disease.   This will be a question for the jury to decide upon the next trial.   A great many assignments of error are made in the motion for a new trial, upon rulings on evidence and upon the charge of the court.   We have not dis-cussed the grounds of the motion seriatim, but have laid down the principles which we think control the case.   The views of the trial judge were not in accord with what we have laid down, and a new trial will have to be granted.

2. One of the charges complained of related to the burden of proof.   This we will not discuss further than to say that the sec-ond headnote gives the rule in regard thereto as laid down in the Civil Code, §§ 5144, 5145.   In the charge given on this subject the judge confused preponderance of evidence with proof to a rea-sonable and moral certainty, confusing the law as to civil cases with the law applicable in criminal cases.   We do not think it proper in a civil case to instruct the jury that the party on whom rests the burden of proof must establish his contention to a reasonable and moral certainty.   If he establishes it by a preponderance or superior weight of evidence, to the satisfaction of the jury, that is sufficient.   As to the meaning of " reasonable and moral certainty," see *Bone* v. *State,* 102 *Ga.* 387.

                    *Judgment reversed.   All the Justices concur.*