27321.   LIFE AND CASUALTY INSURANCE COMPANY OF TENNESSEE *v.* BLACKBURN.

Decided February 21, 1939.

*Carl B. Copeland,* for plaintiff in error.
*Robert B. Blackburn, Hewlett & Dennis,* contra.

Sutton, J.   John H. Blackburn, as beneficiary, brought suit against Life & Casualty Insurance Company of Tennessee to recover, under an insurance policy issued to his son, Frank C. Blackburn, on October 7, 1936, the face value of $1000, penalty and attorney's fees.   It was alleged that the insured died on January 19, 1938, that due proofs of his death had been furnished the insurer, that, although demand for payment had been made, the defendant denied liability and refused to make payment to the plaintiff, that such refusal was in bad faith, and that in consequence thereof plaintiff was entitled to recover, in addition to the principle of $1000, 25 % of such amount as damages, together with reasonable attorney's fees.   By amendment it was alleged that on the date the policy was issued and delivered the insured was in life and in sound health, and that the first premium was paid in cash.   A copy of the policy was attached to the petition as exhibit A and made a part thereof, and to the policy was attached a copy of the application under which the policy was issued.

The defendant answered, admitting the issuance of the policy and the payment of the first premium, the filing of proofs of loss in due time, but denied liability, setting up as the reason for not paying the plaintiff's claim that the insured made false and fraudulent answers to some of the questions asked in the application for insurance, the questions and answers being as follows: "When last sick? June, 1936. Nature of last sickness? Stomach upset. How long sick? Two days. Have you had any surgical operation, serious illness, or accident? Nasal operation in 1935. Have you been attended by a physician during the last five years? If answer yes, give name of complaint, date, how long sick, and name of physician. June, 1936, Dr. Etheridge, stomach upset; February, 1935, nose operation, J. D. Blackburn. Have you had any treatment within last five years at any dispensary, hospital, or sanatorium? If yes, give date, duration, name of ailment, and name of institution. Nasal operation, 1935; one day in hospital." It was further alleged in the answer that the insured concealed from the insurer the fact that when he was treated by Dr. Etheridge he was not only treated for stomach upset but for angina pectoris, and that in answering he further concealed the fact that at various times during the year prior to the time he made the application for insurance he was treated by Dr. E. L. Graydon for high blood pressure, hypertension, and nervousness. It was further alleged that the defendant had tendered to the plaintiff the sum of the premiums which had been paid on the policy, that its acceptance had been refused by the plaintiff, and that it had paid the amount into court as a continuous offer.

The evidence on the trial of the case was substantially as follows: John H. Blackburn testified that the insured, his son, was living with him in October, 1936, had always been healthy, had the appearance of being in fine and robust health, that he weighed about 171 pounds and was 44 years of age, and that the insured died on January 19, 1938; that the insured had been living in a room in Atlanta prior to June, 1936, his best recollection being that at that time the insured moved to his home in Mountain View, Clayton County, Georgia.

Dr. C. H. Paine testified that as a physician and surgeon he examined the insured for the defendant; that he asked the questions and received the answers as set out in the application for insurance;

that at that time the insured did not say anything about having been in Crawford W. Long Hospital, or anything about Dr. Etheridge having treated him in that hospital; that the company did not ask for urinalysis and blood pressure in the case of a policy in the amount here involved, and that from the examination he made, so far as he could tell, the insured had nothing indicating a condition of bad health; that the statements made by the insured to him did not indicate any bad health, and that, so far as the witness could tell, the insured was in good health; that in the examination he had to rely in a sense on the answers made to the questions asked; that he used a stethoscope and had the insured to unbutton his shirt and did not discover anything wrong with his heart, but that he could not have told from such examination whether or not· the insured had angina pectoris at the time. In answer to a hypothetical question, based on facts in evidence, he stated that if the insured was taken suddenly sick on January 19, 1938, and had had bronchitis and cold for a period of weeks, with severe coughing spells, and at 9:30 a. m. on January 19, 1938, had intense pains under the upper end of the sternum, went to bed, was comfortable after lunch, and at 3:15 p. m. his blood pressure was normal, his pulse normal, and at 3:53 he complained of blindness and then died within two minutes, in the opinion of the witness the insured had a heart attack at the time mentioned.

Dr. J. C. Stewart testified that he was called to see the insured on June 29, 1936, and that when he arrived he found him suffering with pain in his chest, pain extending to his left arm, that he gave him a hypodermic, staying with him thirty minutes or an hour, examined his heart, took his pulse, and that from his examination the witness was of the opinion that at that time the insured had angina pectoris; that he remained with the insured until his regular physician, Dr. Etheridge, came and took him to the Crawford W. Long Hospital. In answering a similar hypothetical question to that asked the witness, Dr. C. H. Paine, he stated that in his opinion the insured died from heart trouble.

Dr. J. H. Etheridge testified that on June 29, 1936, he was called to treat the insured at a drug store at McCall's Crossing, the place of the insured's employment, and found Dr. Stewart with the insured when he arrived; that the insured was suffering quite a little pain in the chest, radiating down the left arm; that Dr. Stewart

had given him morphine and he gave him an additional one-quarter grain; that the pains were substernum; that he took the insured in the witness's car to the Crawford W. Long Hospital, stayed with him until he was easy that night, went back to see him between then and midnight, and also went back the next morning and dismissed him that day; that he did not tell him what his trouble was but diagnosed it as angina pectoris; that he seemed to be all right the day he was dismissed; that he got easy shortly after being taken to the hospital, and said that he had a very comfortable night; that the symptoms described might have been diagnosed as acute indigestion; that without finding some physical basis for the diagnosis he could not have been positive; and that after going over the insured and not finding any organic condition of the heart, he could not say positively that the trouble was or was not angina pectoris, but that the trouble looked like that when he examined the patient; that, however, angina pectoris might be confused with acute indigestion, and whatever he had did not last long; that angina pectoris does not usually last very long and the patient gets relief usually in a limited time; that in his examination of the patient he did not find any organic heart trouble; that his blood pressure was within normal limits, and what he gave him was for the relief of pain in any form. In answering the hypothetical question that was also propounded to the witness Paine he stated that, as to the cause of the insured's death, he would have to know more about the case, that, as to his having had a pulmonary embolism, that condition would cause such a death, a pulmonary embolism being a foreign substance stopping some pulmonary blood vessel, and that angina pectoris also might cause such a death, coronary embolism would cause it, and a number of other things might cause such a death.

E. L. Hood testified that he was a retail druggist, that the insured began to work for him about June 1, 1935, and worked continuously up until the time of his death, losing three days in three years' time on the occasion when Dr. Etheridge treated him; that he did not know of any trouble that he had other than that time; that he had some indigestion trouble and complained of things of that kind just at that particular time, and that that was the only time he heard him complain, and he seemed to be in good health all the time.

Dr. John D. Blackburn testified that he was a brother of the insured; that the insured looked like he was in good health, and that he saw him the morning following the attack or sickness at the drug store and made an examination of him; that there was not anything the matter with his heart, and that the interne had written on the hospital chart that the trouble was angina but that he explained to his brother that it was not angina, told him to get up and go home, and that he did dress and go home, and that after that the witness did not know of his brother having any similar attack; that the witness was sure his brother did not have the signs or symptoms of angina pectoris; that he was present when the insured died; that he had dropped by to see his father, not knowing that the brother was sick, and that his father said the insured had had a coughing spell, was lying down before going to work, and that he went in to see him; that the brother informed him of his coughing spell; that his blood pressure was normal, his pulse normal; that he went over every valve area in his heart and it was perfectly normal as far as one could tell; that as the witness went across the room he asked his father to open the insured's shirt as he thought he would listen to his heart; that just as he turned around the insured said that he was going blind, and by the time the witness turned around the insured was dead; that the insured did not tell him about having any pain except when he had the coughing spell that morning, at the upper part of the breast bone; that the witness made a diagnosis of pulmonary embolus, and that he figured that when the insured was coughing he slit or ruptured a small blood vessel in his chest, and, being relaxed, six hours later, he got a pulmonary embolus; that if a little blood vessel is broken somewhere, when one relaxes a small clot of blood will slough off and come through the blood stream; that his brother did not complain of any radiation of pain in his chest, did not ask for any medicine to alleviate his pain, but felt all right before his death; that angina is very painful.

E. L. Fowler testified that he was an attorney at law by profession, and that, in his opinion, a reasonable attorney's fee for prosecuting a suit like the present one would be 25 % or 33 1/3 % of the face value of the policy.

The following documents were introduced in evidence: A copy of the policy, together with copy of application which was attached

to the policy, proofs of loss, claimant's written statement, and attending physician's written statement. The policy contained, among others, the following provision: "This policy and the application therefor shall constitute the entire contract, and all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no such statement of the insured shall avoid or be used in defense of a claim under this policy unless contained in the written application therefor, copy of which is endorsed hereon or attached hereto." The application, signed by the insured and dated September 24, 1936, contained the following provision: "It is understood and agreed: 1st. That the foregoing statements and answers are correct and wholly true, and, together with the answers with questions on part b hereof, they shall form the basis of the contract of insurance if one be issued."

The jury returned a verdict in favor of the plaintiff for the face value of the policy, $1000, and interest, and $100 attorney's fee. The defendant filed a motion for new trial on the general grounds, and by amendment added several special grounds, all of which are dealt with hereinafter. The exception is to the judgment overruling the motion.

■ The defenses set up by the answer of the defendant are (1) that the insured made certain false and fraudulent representations which induced it to issue the policy, and (2) that he concealed the fact, as contended by the insurer, that he had been treated by Dr. J. H. Etheridge, "not only for stomach upset but for angina pectoris," and at various times during the year prior to the time when he made the application for insurance had been treated by Dr. E. L. Graydon for high blood pressure, hypertension, and nervousness. No evidence was introduced as to any treatment by Dr. Graydon, and no further reference need be made to this contention. As to the contention that false and fraudulent representations were made by the insured, the evidence is equally lacking in proof. The insured represented that he was last sick in June, 1936, that the nature of such sickness was stomach upset, that he was sick two days, that he had a nasal operation in 1935, which was performed by Dr. J. D. Blackburn, and he was one day in a hospital at that time, and that he was attended by a physician, Dr. J. D. Etheridge, for stomach upset in June, 1936. The plaintiff in error conceives that these representations were false and fraudulent, in that, as it

contends, the insured was treated for two days for angina pectoris in the Crawford W. Long Hospital by Dr. Etheridge. The statements made by the insured were affirmations of positive facts, and, as stated, there was no proof that what was represented was not literally true. At most, the argument of the plaintiff in error amounts to a contention that there were *concealments,* just as in its answer it alleged that the insured concealed the fact that "when he was treated by Dr. Etheridge he was not only treated for stomach upset but for angina pectoris." The representations not having been shown to be untrue, the jury was authorized to find in favor of the plaintiff on that feature of the case.

As to concealments the following provisions of the Code apply: "A failure to state a material fact, if not done fraudulently, shall not void the contract; but the wilful concealment of such a fact, which would enhance the risk, shall void the policy." Code, § 56-822. "Wilful misrepresentation by the insured, or his agent, as to the interest of the insured, or as to other insurance, or as to any other material inquiry made, shall void the policy." Code, § 56-824. In *Mutual Benefit Health &c. Asso.* v. *Bell,* 49 *Ga. App.* 640, 649 (176 S. E. 124), after a full discussion of numerous rulings of the appellate courts of this State on the question of concealment, it was said: "So it is our opinion that under the decisions of our appellate courts, construing sections 2481 and 2483 of the Code [§§ 56-822 and 56-824 of the Code of 1933], before a failure to state a material fact in an application for insurance, which is attached to and forms a part of the policy, will void the policy, the omission must have been fraudulent, and before the concealment of such a fact as would enhance the risk will void the policy, the same must have been wilfully made by the applicant, and that in a suit on a policy of insurance, where the insurer depends upon the ground of the failure of the applicant to state a material fact in his application or of his concealment of a fact which would enhance the risk, evidence is admissible which tends to show that the applicant, in failing to state such material fact, did not fail to do so fraudulently, or, in concealing a fact which enhances the risk assumed by the insurer, did not do so wilfully. It was competent, in this case, for the jury to pass upon the bona fides of the applicant in stating in his application, in answer to the question whether he had other accident or health insurance, that he had

a policy with a named company, without disclosing that he had two policies of life insurance, each containing a total-disability clause." Can it be said in the present suit that the insured fraudulently omitted to state a material fact, or that he wilfully concealed a fact which enhanced the risk? We do not think so.

It was shown by the evidence that the insured, with the exception of occasional indigestion, had been in fine and robust health before the attack of illness in June, 1936; that in several years he had missed only three days from work at a drug store where he was employed, this absence being on the occasion of his illness in 1936; that, while, in answer to a hypothetical question, two or three physicians testified that in their opinion the insured died from angina pectoris, it was not conclusively determined that at the time of his illness he was suffering from such trouble; that when the insured was taken ill at work he complained of pains in his chest, extending to his left arm; that the trouble was diagnosed by a physician who examined him pending the arrival of Dr. Etheridge as angina pectoris, but that he did not so inform the insured; that Dr. Etheridge first diagnosed the trouble as angina pectoris, but did not so inform the insured, and stated on the trial of the case that the trouble might have been diagnosed as acute indigestion and he could not say positively that it was angina pectoris and might be confused with acute indigestion; that his blood pressure, pulse, and temperature were just about normal; that there was no actual determination that there was any heart involvement, and the only medicine administered was at the time he was taken sick at the drug store, and consisted of one-quarter grain of morphine given by Dr. Stewart and a similar quantity given by Dr. Etheridge; that Dr. John D. Blackburn testified that he saw the insured the morning after he was taken to the hospital and that there was nothing wrong with his heart; that, although the interne had written on the hospital chart that the patient's trouble was angina pectoris, he informed his brother that he had no such trouble, told him to get up and go home, and that he did so; that he was present when the insured died, on January 19, 1938, having dropped by the home to see his father and unexpectedly finding his brother sick, and was told that he had had a coughing spell and was lying down, whereupon he went in the room where the insured was; that his blood pressure and pulse were normal; that he went over every valve in the heart of

the insured, and that it was perfectly normal as far as he could tell; that he went to a side of the room away from the insured and while about to return to him heard him say that he was going blind and that he suddenly died; that he figured that the insured, while coughing previously, had ruptured or slit a small blood vessel in his chest, subsequent to which a clot of blood, or embolus, broke loose into the blood stream, causing the death of the insured. Thus, in the uncertainty of what was the real nature of the illness of the insured in June, 1936, when he suffered an attack of some sort at the drug store where he was employed, and what was the actual cause of the insured's death, whether from angina pectoris or from an embolus, with no evidence of anybody suggesting to the insured that anything was wrong with his heart, how could it be said of the insured, a man who had had occasional attacks of indigestion, that the evidence demanded a finding that he had fraudulently omitted to state a material fact or that he wilfully concealed a fact which increased the risk? We think that the jury was authorized to find that he did not know that he had angina pectoris, if he had it, and that in good faith he regarded his trouble as being due only to indigestion or, as expressed by him, an "upset stomach." It is further contended that the insured's failure to state that he had been in Crawford W. Long Hospital two days was such a concealment as would avoid the policy. Admitting that he concealed this fact, the only occasion when he was in that hospital was in June, 1936, for two days, when he was examined by Dr. Etheridge, but when no treatment whatever was given him. It is not contended that he had any other attack than that which the insured described as stomach upset, and the mere fact of being in the hospital did not of itself enhance the risk. In answer to the specific question as to whether or not he had had any *treatment* at a hospital within the past five years he stated "Nasal operation, 1935, one day in hospital." Even if it could be said that examination and supervision for two days in Crawford W. Long Hospital amounted to "treatment," the jury might quite reasonably have found that the insured construed the word in a narrower sense, and, accordingly, that he did not fraudulently or wilfully conceal the fact that he *had been* in a hospital on an occasion other than when he was *treated* or had a nasal operation.

The first special ground of the motion for new trial com-

plains of the charge of the court, "Now, I charge you, gentlemen, that if you believe in this case, on the question of the insured whether he was in good health or sound health at the time the policy was issued, whether or not he represented in good faith that he was in sound health, and on the strength of such representation, and upon the opinion of the agent this policy was issued, and was in good faith accepted by the assured, the policy would not be void by reason of the fact that the insured might have been then afflicted with an incipient, unknown, fatal malady, which had not at that time manifested itself or in any way deranged and impaired or injured the general soundness of the insured," it being contended that it tended to confuse and mislead the jury, was prejudicial in that it instructed the jury that the plaintiff would be entitled to recover even though the insured made false representations in good faith, that it was not authorized by the evidence and was an incorrect statement of the law where the application was attached to and made a part of the policy. In the application for insurance the applicant was not asked if he was in "good health." However, the policy provided that "this policy shall not take effect until the first premium shall have been paid in cash and the contract delivered and accepted during the lifetime and good health of the insured," and the plaintiff alleged in his petition that at the time the policy was delivered the insured was in good health. The provision as to the policy being delivered and accepted during the lifetime and good health of the insured, is obviously made for the purpose of protecting the company against a new element of risk because of a change in the applicant's condition arising after the acceptance of the application, and deals with a specific term not referred to in the application, the definition of which is not affected by the fact that the application was attached to the policy and made a part thereof. "Good health" or "sound health," as used in a policy of insurance, means "that the applicant has no grave impairment or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system." *National Life & Accident Ins. Co.* v. *Smith*, 34 *Ga. App.* 242 (1) (129 S. E. 113). "Thus, where the assured represents in good faith that he is in sound health, and, on the strength of such representation and upon the opinion of its agent, the policy is issued, and is in good faith accepted by the assured, the policy will not be

avoided by reason of the fact that he might have been then afflicted with an incipient, unknown, and fatal malady which had not at that time manifested itself or in any way deranged, impaired, or affected the general soundness and healthfulness of the system." *National Life &c. Co.* v. *Martin,* 35 *Ga. App.* 1 (2) (132 S. E. 120). The court charged the jury in words that indicate that the applicant had made a representation as to good health, which was, in fact, not done, but in this the defendant was not harmed; and the instruction as to representation of good health was a correct statement of the law, as shown above, was authorized by the plaintiff's pleading, the provision of the policy, and the evidence as to the apparent sound health of the insured at the time the policy was delivered, and was not error for any reason assigned.

■ The second special ground complains that the court erred in charging the jury that the answers in the application for insurance were made, by the policy, representations and not warranties, it being contended that it was a misstatement of the terms of the policy and prejudicial in being an incorrect statement of the law under the terms of the policy. Plaintiff in error is correct in its contention that the instruction was a misstatement of the terms of the policy, as it was therein provided: "This policy and the application therefor shall constitute the entire contract, and all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no such statement of the insured shall avoid or be used in defense of a claim under this policy unless contained in the written application herefor, copy of which is endorsed hereon or attached hereto." Thus, by contract, the parties have agreed that such answers, in the absence of fraud, shall be deemed representations, and, where fraud does exist, shall be deemed warranties, the insurance company thereby contracting away some of its rights under the law of this State. This is true for the reason that, without such provision, where the application is attached to and made a part of the policy, the answers to questions in a written application are to be deemed warranties, and "any variation in any of them, which is material, whereby the nature or extent or character of the risk is changed, will avoid the policy, whether the statement was made in good faith or wilfully or fraudulently." *Supreme Conclave Knights of Damon* v. *Wood,* 120 *Ga.* 328 (47 S. E. 940), and many other cases cited in *National*

*Life &c. Co.* v. *Gordon,* 183 *Ga.* 577, 582 (188 S. E. 894). In the present case, however, where the burden rested upon the defendant to establish the falsity of the answers, and the jury was not only authorizd to find that the answers had not been shown to be untrue but the evidence demanded a finding in that respect, they must be taken as true. In that situation the question whether the answers are to be deemed representations or warranties becomes immaterial, and, while the statement of the court is subject to criticism, it was not, in view of the truthfulness of the answers, harmful to the defendant.

■ The third special ground complains that the court erred in charging the jury that "a representation in this application to affect or void the policy in the first place must be false, and must be wilfully false, and it must be material," it being contended that it was an incorrect statement of the law where the application is attached to and made a part of the policy, and prejudicial in that it instructed the jury that if false answers were made to the questions they would have to be wilfully false as well as material. Inasmuch as the evidence demanded a finding that the answers were not false, the question raised in this ground becomes immaterial, and the charge could not be said to have been harmful to the defendant.

■ The fourth special ground complains that the court erred in charging the jury on the question of damages and attorney's fees, it being contended that such charge was not authorized by the evidence. The jury in the present case awarded $100 attorney's fees but no penalty. Ordinarily the question of good faith is for the jury. But damages and attorney's fees can in no case be awarded where the defendant has any reasonable ground for contesting the claim of the plaintiff. *German American Life Asso.* v. *Farley,* 102 *Ga.* 720, 745 (29 S. E. 615). While it is not shown that the representations made in the application for insurance were not true, we think that, as to the alleged concealments by the insured, it could not be said that the defendant's refusal to pay the claim was frivolous or unfounded, the test of bad faith, but that under all the facts of the case the defendant had the right to have the question of concealments adjudicated in a court of law. Accordingly, the judgment of the trial court is being affirmed with direction that the $100 attorney's fees be written off of the verdict and judgment;

otherwise the judgment to stand reversed.   This disposes of the objection in the fourth special ground of the motion.

*Judgment affirmed, with direction.   Stephens, P. J., and Felton, J., concur.*